UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT
2
                              )
3   UNITED STATES OF AMERICA,  )   No. 3:17-CR-00160-VLB-2
                              )   450 Main Street
4              vs.             )   Hartford, Connecticut
                              )
5   ORLANDO QUIROS, et al.     )   February 14, 2019
    ─────────────────────────── )
6
                   TRANSCRIPT OF SENTENCING
7
           BEFORE THE HONORABLE VANESSA L. BRYANT
8
                 UNITED STATES DISTRICT JUDGE
9
    APPEARANCES:
10  For the Plaintiff:       H. GORDON HALL, ESQ.
                             United States Attorney's Office
11                           157 Church Street
                             25th Floor
12                           New Haven, CT 06510

13  For the Defendant:       BRIAN J. WOOLF, ESQ.
                             Woolf Law Firm, LLC
14                           50 Founders Plaza
                             East Hartford, CT 06108
15
                             TAMAR BIRCKHEAD, ESQ.
16                           Parrett, Porto, Parese & Colwell,
                             P.C.
17                           One Hamden Center
                             2319 Whitney Avenue
18                           Suite 1-D
                             Hamden, CT 06518
19

20  Also Present:            PAUL COLLETTE

21  ECR Operator:            F. VELEZ

22                   Sara Bernstein, CDLT-127
                         eScribers, LLC
23                     352 Seventh Avenue
                         Suite #604
24                     New York, NY 10001
                       (973) 406-2250
25

1                                    I N D E X

2    RULINGS:                                          PAGE   LINE
     Pre-sentence report to be sent to Bureau            5     25
3    of Prisons
     Sentence of 136 months of incarceration           47     3
4    Defendant to forfeit his firearm                   51     21
     Counts II, III, IV, VI, VII dismissed             52     13

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy

1          (1:07 O'CLOCK, P.M.)

2          THE CLERK:  The Honorable United States District

3    Court is now open after recess in the matter of USA v. Quiros,

4    case number 3:17-CR-00160-VLB-1.

5          THE COURT:  Good afternoon.

6          May we have the appearances of the parties for the

7    record?

8          MR. HALL:  Good afternoon, Your Honor.  Gordon Hall

9    for the United States.  And with me are Special Agent Frank

10   Castiglione (ph.) and Task Force Officer Joshua Cameron from

11   the Drug Enforcement Administration.

12         THE COURT:  Good afternoon.

13         MR. WOOLF:  Good afternoon, Your Honor.  Attorney

14   Brian Woolf on behalf of Mr. Quiros, who is to my right.  And

15   to his right, is Attorney Tamar Birckhead, who is a member of

16   the federal bar here in Connecticut, who had assisted me with

17   respect to the assent (ph.) preparation for the sentencing.

18   I'm going to ask the Court to let her sit at counsel table.

19         THE COURT:  Certainly.

20         MR. WOOLF:  Thank you very much, Your Honor.

21         THE COURT:  You're welcome.

22         MS. BIRCKHEAD:  Thank you, Your Honor.

23         THE COURT:  You're welcome.

24         And Mr. Collette is here representing the probation

25   office.

Colloquy

1    All right.  Mr. Quiros, it says you know you've

2  entered a guilty plea to two counts of the indictment:  one

3  charging you with being a prohibited person in possession of a

4  firearm, and another one charging you with conspiracy to

5  possess, with the intent to distribute, and with distribution

6  of controlled substance.  At the time you entered your guilty

7  plea, I am advised that you were told that the probation

8  office would conduct a pre-sentence interview, were you not?

9    THE DEFENDANT:  Yes, yes.

10    THE COURT:  And were you told that you could and you

11  should have your counsel present with you --

12    THE DEFENDANT:  Yes, Your Honor.

13    THE COURT:  -- during that interview process?

14    THE DEFENDANT:  Yes.

15    THE COURT:  And were you interviewed by the probation

16  office?

17    THE DEFENDANT:  Yes, Your Honor.

18    THE COURT:  Did you have your counsel present with

19  you?

20    THE DEFENDANT:  Yes, Your Honor.

21    THE COURT:  Did you read the pre-sentence report?

22    THE DEFENDANT:  Yes.

23    THE COURT:  Do you believe that there are any

24  misstatements of fact in the pre-sentence report?  Are there

25  any incorrect facts in the pre-sentence report?

Colloquy

1    MR. WOOLF: There was just one -- if I may, there was

2  an omission of one of his -- one of his stepsons in the -- it

3  was not mentioned in paragraph 55, I believe that it was.

4    THE COURT: Um-hum.

5    MR. WOOLF: It is the -- I'd like added to that --

6  his name is -- his name is A.C. and he's thirteen years old.

7  He also lives in the household with Bernice Castro (ph.),

8  who's the mother of his other child. So there's two children

9  who live in the household.

10    THE COURT: All right. The Court would ask that the

11  probation officer amend the pre-sentence report to add the

12  name of the child.

13    MR. COLLETTE: Yes, Your Honor.

14    MR. WOOLF: A.C., X-X-X-X-X-X.

15    Thank you.

16    THE COURT: You're welcome.

17    MR. WOOLF: Other than that, I don't believe there

18  are any other matters that need to be brought to the attention

19  regarding factual issues of the pre-sentence report.

20    THE COURT: Does the Government have any objections

21  to the facts stated in the pre-sentence report?

22    MR. HALL: No, Your Honor.

23    THE COURT: In that case, the Court adopts the facts

24  stated in the pre-sentence report as its findings of facts and

25  order that the pre-sentence report be forwarded to the Bureau

Colloquy

1    of Prison, together with the transcript of the proceedings

2    here this afternoon.

3         Now, Mr. Quiros, I'm going to hear first from the

4    Government, since they bear the burden of proof.  And then I

5    will hear from the defense.  You have the right to make a

6    statement before the Court imposes the sentence.  Do you

7    intend to make a statement?

8         THE DEFENDANT:  Yes, Your Honor.

9         THE COURT:  Okay.  And you have submitted, through

10   your attorney, letters of individuals in support of you.  If

11   there's anyone here who would like to make a statement, they

12   may do so as well during the defense portion of the

13   proceedings, prior to the imposition of sentencing.

14        So with that, I'll hear first from the Government.

15        MR. HALL:  Thank you, Your Honor.

16        THE COURT:  You're welcome.

17        MR. HALL:  As the Court's aware, in this case, as in

18   the other cases of this -- or the other defendants in this

19   case, the Government and the defense have agreed, in the plea

20   agreement, to a guideline stipulation, which is the same as

21   Probation's, except for the inclusion by the Office of

22   Probation of a two-level increase for possession of a firearm.

23   That was excluded from the stipulation entered into by the

24   parties because -- for two reasons, and I indicated this in my

25   memorandum.

Colloquy

1    First, under the application note to the guideline

2    section, in section 2, it would be incumbent upon the

3    Government to establish that there was a connection between

4    the weapon and the offense conduct.  And as the Court is, I

5    think, aware, this was a wiretap case.  And the phone -- some

6    of the phones that you listened to over a period of time were

7    held by or spoken on by Mr. Quiros.  And we didn't have an

8    indication of violent activity or gun related activity by Mr.

9    Quiros in connection with his business.  It seemed, very much,

10   to be a business.

11   In addition, the defendant entered a plea of guilty.

12   As the Court's also aware, he will be sentenced today on a

13   felon-in-possession count.  So under those circumstances, I

14   typically don't include the two-level increase for the firearm

15   when he's -- well, when he pleads to the firearm also.  So

16   that's why we did that.

17   And I would just ask that the Court, under Fernandez,

18   give effect to the plea agreement.  Because I believe that,

19   other than that, we were in agreement with probation on

20   everything.

21   The other thing I need to mention is that I was

22   trying this afternoon to create, on a computer upstairs, a

23   motion for order of forfeiture of the firearm that was a

24   Taurus .357 Magnum revolver, bearing serial number 1J219632,

25   and forty-three rounds of Mag-Tac .38 caliber ammunition,

Colloquy

1    which was seized from the premises at 873 West Boulevard,

2    Apartment 408, in Hartford, on July 26th, at the time of the

3    arrests in this case.  I failed to be able to get that out of

4    a computer upstairs.  And so I do intend to make an oral

5    motion for that.  I've indicated to Mr. Schaeffer (ph.) that

6    I'll get a written motion and order to you either today or

7    first thing tomorrow so that you have something to decide if

8    you choose to grant the motion.

9            THE COURT:  And is there anything else that would

10   be -- that's been seized from the defendant that he would

11   forfeit here?

12           MR. HALL:  There's a number of items.  The gun is

13   being held by ATF so that's sort of been walled off -- not

14   walled off.  It's become separate from the other assets.  But

15   the DEA has administratively forfeited -- or is in the process

16   of doing so -- a Maserati automobile, approximately 300,000

17   dollars of U.S. currency.  I think that there was another

18   vehicle as well.  I'm not -- I think it was an Acura or

19   something, but it wasn't as significant as the Maserati, which

20   is a late-model car and I guess is worth a lot of money.

21           So those assets were basically what we had from Mr.

22   Quiros that was of -- that were of substantial value.  And

23   those have been forfeited already administratively or they're

24   being forfeited.  And I just needed to make sure that the gun

25   goes, too.

Colloquy

1    THE COURT:  And where were those vehicles?

2    MR. HALL:  One of the vehicles was at one the

3    residences; I don't recall which.  That would be the non-

4    Maserati.  The Maserati was held in a storage facility by the

5    defendant.  I don't know where, but during the course of our

6    discussions -- Mr. Woolf's and mine and his with his client --

7    we did have the key.  We did seize the key from, I think, Mr.

8    Quiros' residence.  And so they ultimately made the car

9    available to the DEA so that it could be seized --

10    THE COURT:  Um-hum.

11    MR. HALL:  -- and forfeited.

12    MR. WOOLF:  That is accurate, Your Honor.

13    If I may, Mr. Quiros agreed to voluntarily surrender

14    the vehicle.  The vehicle was towed to my office.  I then

15    contacted the Civil Asset Forfeiture Division of the United

16    States Attorney's Office.  Mr. Sullivan (ph.) then -- through

17    Attorney Hall, then agreed to pick up the vehicle.  And the

18    vehicle was picked up by the Government.

19    This Court does have, and has entered orders already,

20    default orders regarding the Maserati.  I believe the Court

21    issued those orders yesterday.  And we have not contested the

22    forfeiture of that.

23    THE COURT:  And was the residence as lavishly

24    appointed as the Maserati might suggest?

25    MR. HALL:  I would not say so, Your Honor.  They

Colloquy

1    would be fairly typical of what you would find in the area.

2         THE COURT:  And during the wiretaps, did the

3    Government intercept any communications that would tend to

4    verify the defendant's statements during his interview by

5    Probation that he was a concert promoter and Puerto Rican

6    business owner?

7         MR. HALL:  I don't think we were able to detect

8    substantial business activity by the defendant over the

9    wiretaps.  Although I should say that I think that the

10   defendant had access to several facilities, so maybe he had a

11   business phone.  If he had legitimate business going on, it

12   didn't occupy a lot of what we intercepted.

13        THE COURT:  Um-hum.

14        MR. HALL:  I mean, I would suggest to the Court that

15   the money that we seized, the currency that we seized, was

16   drug proceeds.  And I say that because a little over 200,000

17   dollars of it was sized well prior to the arrest in the case,

18   as we were listening to Mr. -- well, I should step back a

19   little bit.

20        Early intercepts over Mr. Quiros' telephone indicated

21   to us that he was preparing to bring -- I believe it was

22   something like 115,000 dollars of U.S. currency to an

23   unidentified male in the New York area.  Our take on it was

24   that this was so that the money could be laundered and perhaps

25   sent on to Puerto Rico, where the source of the cocaine in

1   this case was located.  We didn't get that money.

2          But the conversation made it clear that it was that

3   much money because after Mr. Quiros dropped the money off with

4   whoever it was, they had a conversation about how much money

5   it had been, using sort of numerical shorthand, saying, for

6   example, 115.  But then they went on to discuss that it was

7   short by a small amount of money, several hundred dollars.

8   And they both were talking about how they had run it through a

9   money counter.  And we did find a money counter at the stash

10  house in this case.  And they ended up resolving the

11  discrepancy somehow.  But the point is that that was over

12  100,000 dollars that we missed.

13         Also, before the takedown, before the arrests in this

14  case, based on intercepts, we were aware that Mr. Quiros was

15  once again going to head down to the New York area in order to

16  give U.S. currency to what we believe to be a money-laundering

17  enterprise or that would see that the money got to the source

18  in Puerto Rice, one way or the other.  And we had him stopped,

19  and he had over 200,000 dollars in U.S. currency with them,

20  which was seized at that time.

21         And then in connection with the takedown, we were

22  able to seize from stash house, among many other things, I

23  believe, approximately 100,000 dollars in U.S. currency.  So

24  that's why I used the figure of about 300 because it was 300

25  that we got and then another 100 we missed.  But the business

Colloquy

1    that Mr. Quiros was in was fairly lucrative.

2         THE COURT:  And it was clear that the 115,000 was

3    being laundered, as opposed to reinvested in his drug-

4    trafficking business?

5         MR. HALL:  Well, I would -- I guess I used the term

6    loosely.  It was being brought to another factor.  And we're

7    not sure of the nature of the factor.  I don't think it was

8    being brought to a bank, but certainly, the money was not

9    intended by Mr. Quiros to show his income tax or whatever it

10   is that he files.  And I would say that a substantial portion

11   of the money that Mr. Quiros would have to remit, if that's

12   what he was doing would be for the cocaine, which is kind of

13   expensive also.  So it doesn't represent -- it represents

14   proceeds, in our view, not necessarily profits.

15        THE COURT:  Ah, proceeds, not necessarily profits.

16        MR. HALL:  Yes.

17        THE COURT:  The 115,000?

18        MR. HALL:  Right.  I couldn't suggest -- I couldn't

19   document that the money -- that money, for example, was

20   being -- that Mr. Quiros was attempting to launder it in order

21   to secure all of that money for himself, like, in an offshore

22   account or something, where he would then have access to it.

23   My sense is that it was going to pay for cocaine he had

24   already received and distributed --

25        THE COURT:  I see.

1          MR. HALL:  -- or for cocaine he hoped to receive in

2     exchange for the money, one way or the other.

3          THE COURT:  Um-hum.

4          MR. HALL:  I think.

5          THE COURT:  I see.

6          MR. HALL:  My agents say, yeah, that's right.

7          THE COURT:  Thank you.

8          MR. HALL:  Yes.

9          MR. WOOLF:  As much as that matter hasn't necessarily

10    been addressed before, Your Honor, I'd be happy to also

11    address some of that if the Court would like, with respect to

12    that money.

13         THE COURT:  You're certainly free to bring --

14         MR. WOOLF:  Yeah.

15         THE COURT:  -- to the Court's attention anything you

16    believe relevant to sentencing.

17         MR. WOOLF:  Yeah.  I do think it is relevant.  With

18    respect to the 115,000 dollars, Mr. Quiros was in a music-

19    promotion business.  I can tell that he was in a music-

20    promotion because long prior to this, I've been representing

21    Mr. Quiros for some fifteen-plus years now.  He had come into

22    my office to discuss, when he first -- at the inception of his

23    business, I do assist him with that.  And I had to send him to

24    somebody else because I don't practice in that area of the

25    law.

Colloquy

1    As far as this, I am advised, in discussing this with

2  my client, that that money was derived primarily -- that

3  particular money was derived primarily -- a lot of it was

4  derived primarily from his music business, number one.  And

5  number two, he had planned to file a tax return with respect

6  to that money and had actually filed a request for an

7  extension for that -- to file his tax returns, with respect to

8  that money, but he never got around to filing the tax returns

9  because of his incarceration.

10    THE COURT:  Did he file a request for an extension

11  or --

12    THE DEFENDANT:  Yes.  Yes, Your Honor.

13    THE COURT:  So in order to request an extension, you

14  have to estimate your tax --

15    THE DEFENDANT:  Um-hum.

16    THE COURT:  -- and you have to pay the estimated tax.

17    THE DEFENDANT:  Yeah.  I was in the process of doing

18  all of that.  That's why we asked for an extension.

19    THE COURT:  I'm unclear.  Was the extension request

20  filed with the IRS?

21    THE DEFENDANT:  Yeah, I think so.  I'm pretty sure it

22  is.  I have an accountant and his name was Michael (ph.) -- I

23  forgot his last name, but yes.

24    THE COURT:  Did you sign one?

25    THE DEFENDANT:  Did I what?

Colloquy

1    THE COURT:  Did you sign one?  You would have to sign

2   it.

3    THE DEFENDANT:  Yeah, yeah.

4    THE COURT:  It's just like a tax return.

5    THE DEFENDANT:  Yes, yes.

6    THE COURT:  You have to estimate your tax and you

7   have to pay the estimated tax liability.  Did you pay the

8   estimated tax liability?

9    THE DEFENDANT:  No, because I didn't get to it.  We

10  asked for a file extension to get to do all of that after that

11  because we were still figuring out all the numbers.  I had to

12  bring a bunch of receipts in and all of that.  So I never got

13  a chance to even do it.

14   THE COURT:  Then --

15   THE DEFENDANT:  Because I ended up coming in here.

16   THE COURT:  Then you couldn't have filed for an

17  extension -- not properly, at least.

18   MR. WOOLF:  That's correct.  I mean, what I think Mr.

19  Quiros is trying to indicate to the Court is that he signed

20  for the extension, but the extension had not been -- whether

21  it was filed or not by his person who was preparing his tax

22  return or not, he doesn't know.

23   But clearly, I can indicate to the Court no estimated

24  tax was filed with the -- if it was field, no estimated tax

25  was filed at the time the extension was filed.  He just

Colloquy

1    recalls signing it.  He had someone who's a tax preparer for

2    him, so he signed it.  They were preparing some paperwork and

3    had the paperwork to calculate what amount of taxes apparently

4    was due the Government.  But by that time, he was apprehended.

5              THE COURT:  Has Mr. Quiros complied with the

6    requirement that he fully disclose his financial position?

7              MR. WOOLF:  To this Court?

8              THE COURT:  Yes.

9              MR. WOOLF:  Oh, yes.  He's done his financial

10   affidavit, correct.

11             THE COURT:  And it's accurate?

12             MR. WOOLF:  It is accurate, as far as -- yeah, he

13   signed it.  And he signed it that was accurate, correct.

14             THE COURT:  And where is the 115,000 dollars?

15             MR. WOOLF:  That was part of the 200,000 dollars,

16   Your Honor.  That was taken some months -- this wasn't -- the

17   200,000 dollars that was seized from Mr. Quiros was taken, I

18   would say, two or three months prior to the date that he was

19   apprehended.

20             THE COURT:  Um-hum.

21             MR. WOOLF:  And that 100-and-something-thousand

22   dollars was part of that money that was taken while he was

23   traveling in Connecticut on 95, I believe, or 91 --

24             THE DEFENDANT:  No, no.

25             THE COURT:  As I --

Colloquy

1      THE DEFENDANT:  On Merritt Parkway.

2      MR. WOOLF:  -- on Merritt Parkway.

3      THE COURT:  As I understand it, the Government has

4  heard, over the wiretap communications, Mr. Quiros --

5      MR. WOOLF:  Um-hum.

6      THE COURT:  -- transported that money to an

7  individual in New York.

8      MR. WOOLF:  It was not transported.  It was -- it

9  never -- he never go to New York that day, Your Honor.

10      THE COURT:  It --

11      MR. HALL:  Excuse me.  I'm sorry.  But I think that

12  there's some confusion.  There was a -- and I don't think it's

13  Your Honor that is confused.  I think that there was, like,

14  115,000 dollars that we believe was brought by Mr. Quiros to

15  some person in New York.  We did not intercept that.  That

16  made it to the other person.  Because we heard them talking --

17  Mr. Quiros and the other guy -- about whether the amount was

18  right, and they counted it, and all that other stuff.  We

19  didn't get that.

20      Then after that, there was another trip.  And there

21  was 210 or something like that -- I think 210,000, something

22  like that.  We did take that from him.  That's been forfeited.

23      THE COURT:  So --

24      MR. HALL:  And at the time of the arrest, there was

25  another, approximately, 100,000 dollars, something like that,

1  that we took from what we call the stash house.  And that's

2  been forfeited also.

3          THE COURT:  So I'm talking -- thank you.

4          I'm talking about the 115,000 dollars that Mr. Quiros

5  took to an individual in New York, and about which he had a

6  discussion with that individual concerning a shortage.

7          MR. WOOLF:  I can't -- this is the first time that

8  I've been asked to address that issue.  I really can't address

9  that issue and adequately respond to Your Honor.  If you give

10 me a moment and let me talk to my client, I'll be happy to.

11         THE COURT:  Would you like a recess?

12         Let's recess --

13         MR. HALL:  Just a short --

14         THE COURT:  -- so that you can --

15         MR. WOOLF:  Sure, thank you.

16         THE CLERK:  All rise.  The Honorable United States

17 District Court is now in recess.

18         (Recess)

19         THE CLERK:  Your Honor, the Honorable United States

20 District Court is now open after recess.

21         THE COURT:  All righty.  Have you had a chance to

22 look at your financial affidavit again?

23         MR. WOOLF:  Yes.  Well, we didn't -- we know the

24 financial affidavit, what it is.

25         THE COURT:  All right.

Colloquy

1          MR. WOOLF:  We have discussed it with my client.

2          THE COURT:  Yes.

3          MR. WOOLF:  The 115,000 dollars that Attorney Hall

4     was alluding to was, in fact, delivered to New York.

5          THE COURT:  Was in fact --

6          MR. WOOLF:  It was --

7          THE COURT:  -- delivered?

8          MR. WOOLF:  It was in fact delivered to New York.

9          THE COURT:  Yes?

10         MR. WOOLF:  And that's the last that Mr. Quiros knows

11    of where the money went.  He does not have that money.  It's

12    not in his possession, nor in his control.

13         MR. HALL:  Okay.  I think I mentioned two cars.  One

14    of them was the Maserati.

15         THE COURT:  Um-hum.

16         MR. HALL:  The other one was not an Acura; I

17    misremembered.  There was a car like that in the past, but the

18    other car was a BMW, a late model 6 Series, expensive car,

19    that kind of thing.

20         THE COURT:  Hm.

21         MR. HALL:  That's been forfeited.  And as I pointed

22    out before, on the day of the arrest in this case, we

23    seized -- in addition to the roughly 100,000 dollars from the

24    stash house, there were, I think, something like seven kilos

25    of cocaine there, which based on the course of dealing that we

Colloquy

1    observed, Mr. Quiros, I think, would have either paid for

2    those or owed for those, one way or the other -- because it

3    was his cocaine by that time and he took it.  So that's like

4    120,000 dollars or so, maybe 130- at the wholesale rate that

5    he would have paid for.  I don't know exactly what he was

6    paying them, just so --

7             THE COURT:  Yes.

8             MR. WOOLF:  I would also like to indicate to the

9    Court that both -- the Maserati, in particular, was a used

10   Maserati.  The value was approximately 70,000 dollars, of

11   which Mr. Quiros actually borrowed about 40,000 dollars from

12   the credit union.

13            THE COURT:  I don't see that as -- listed as a

14   liability.

15            MR. WOOLF:  No, no.  We've agreed to the Government's

16   seizure of that.

17            THE COURT:  But what about the credit union loan?  I

18   don't see that listed as a liability.

19            MR. WOOLF:  I believe it was listed, Your Honor.

20            THE COURT:  Is it?

21            MR. WOOLF:  Yes, Your Honor.

22            THE COURT:  70,000 dollars?

23            MR. WOOLF:  No, it wasn't 70,000.  It was something

24   like --

25            THE COURT:  Oh, 35,000.

Colloquy

1          MR. WOOLF:  -- 35,000.

2          THE COURT:  Sorry, yeah.

3          MR. WOOLF:  And it was borrowed it -- it was

4    borrowed.  So he basically financed -- had to finance it.  And

5    I do know --

6          THE COURT:  Very well.

7          MR. WOOLF:  -- from following the asset-forfeiture

8    aspect of this, which is in front of Your Honor --

9          THE COURT:  Um-hum.

10         MR. WOOLF:  -- that the credit union has filed an

11   appearance in the asset forfeiture with respect to its

12   interest in the Maserati.  And their total equity of the

13   Maserati, I believe, was something a little over 20-plus

14   thousand dollars.  That was all.

15         THE COURT:  Can you read what it says under

16   "liabilities" in line 1?  I can't make out what that says.

17   "Vehicle lease"?

18         MR. HALL:  I don't have access, of course, to the

19   affidavit.  But I can say that if the Maserati was forfeited

20   in the normal course, then depending on what the Government

21   ended up choosing to do with it, either the Government would

22   have had to pay the lien to keep the car, if that's what they

23   decided to do, and use or whatever.  Or if it was auctioned,

24   then the bank or the financing company would have been paid

25   out of the proceeds of the auction.

Colloquy

1      THE COURT:  Um-hum.

2      MR. HALL:  I think that's how it would work.

3      MR. WOOLF:  From my review -- from my review of the

4  financial affidavit, under "liabilities" --

5      THE COURT:  Yes.

6      MR. WOOLF:  -- there's 40,000 dollars of balance

7  outstanding and that was subject to forfeiture.

8      THE COURT:  That's line 2 for the Mercedes?

9      MR. WOOLF:  Excuse me?  For --

10     THE COURT:  Is that line 2 for the Mercedes?  Is that

11  what that says?  I'm just having a hard time reading it.

12     MR. WOOLF:  Let me just pull this closer to me.

13     THE COURT:  I think it's 40,000 dollars.  That's line

14  2 under "liabilities".

15     MR. WOOLF:  The first one is vehicle loan to Yoda

16  Financial (ph.) --

17     THE COURT:  20 --

18     MR. WOOLF:  -- 25,000.

19     The second one was vehicle, Maserati Levante --

20     THE COURT:  Ah.

21     MR. WOOLF:  That's Connex Credit Union, balance

22  outstanding, 40,000.

23     THE COURT:  Um-hum.

24     MR. WOOLF:  And the BMW, the balance outstanding was

25  20,000 dollars on that one, which was also subject to asset

Colloquy

1    forfeiture.  And then there's some credit cards.

2          THE COURT:  And all those liabilities have been

3    extinguished by virtue of the forfeiture?

4          MR. HALL:  Paid off, probably, because of the

5    forfeiture.  And I think there was another vehicle which just

6    ended up going back to either the finance company or the

7    dealer.  There was a truck.

8          THE COURT:  Um-hum.

9          MR. HALL:  It was almost new, but it was extensively

10   financed and very expensive.  And I think that one just went

11   back to whoever would have had the interest in it --

12         THE COURT:  Okay.

13         MR. HALL:  -- not Mr. Quiros.

14         THE COURT:  And Mr. Quiros has no idea of his

15   spouse's assets in line -- in the --

16         MR. WOOLF:  Well, they're not -- they're not -- the

17   wife is not -- they're not formally married, Your Honor.

18         THE COURT:  They're not legally married?

19         MR. WOOLF:  They're not legally married, I should

20   say.  Correct.

21         Thank you.

22         THE COURT:  Do they have a joint household?

23         MR. WOOLF:  They did -- with Ms. Castro, correct,

24   who's here today.

25         THE COURT:  So because she's not his spouse, even

Colloquy

1  though she benefitted from his financial largesse, her assets

2  are unknown?  Or is there some other woman who's the wife?

3           MR. WOOLF:  It's a little complicated.  There are two

4  mothers of his children.  One is named Brenda Feliciano (ph.)

5  and he has two children with her.  And there is Ms. Castro --

6  Bernice Castro.  He has one child with her.

7           THE COURT:  And with Ms. Castro, he has a household?

8           MR. WOOLF:  They had a household together.  That was

9  his primary residence, correct.

10          THE COURT:  Um-hum.  And they combined their assets?

11          MR. WOOLF:  I don't know that.

12          THE COURT:  You don't know that?

13          MR. WOOLF:  Yeah, I know -- I don't -- I think Ms.

14  Castro -- I know she's employed.  I believe she's employed at

15  a bank.  But how long she's been employed, I don't know.

16          THE COURT:  So I'm to believe that Ms. Castro was

17  supporting herself totally separate and independent of Mr.

18  Quiros, but we should include -- I suppose it's her child --

19          MR. WOOLF:  That is --

20          THE COURT:  -- as one of the children he was

21  supporting.

22          MR. WOOLF:  That is correct.

23          THE COURT:  All right.

24          MR. WOOLF:  Not only that, but a child that is not

25  born -- is born to Ms. Castro -- an additional child -- two

Colloquy

1  children who were born to Ms. Castro, which are not -- who are

2  in the household that he was assisting her in supporting them

3  as well.

4          THE COURT:  He was assisting in supporting?

5          MR. WOOLF:  He was helping to support those children

6  as well, yes.

7          THE COURT:  All righty.  Please proceed.

8          MR. WOOLF:  It's my turn?

9          THE COURT:  Yes.

10         MR. WOOLF:  Thank you, Your Honor.

11         THE COURT:  Um-hum.

12         MR. WOOLF:  Your Honor, we tried to prepare as

13 thorough a memorandum and aid in sentencing as we possibly

14 could.  So I don't want to regurgitate our memorandum and aid

15 in sentencing.  I'd like to hit on some highlights, but I'd

16 like to really talk about Mr. Quiros himself at some point, as

17 would others.

18         Mr. Quiros has now been incarcerated for nineteen

19 months.  He's forty-two years old.  And as was indicated in

20 the PSR, he was raised in a stable and nurturing family

21 environment, his mother and father.  His father is a former

22 DOC employee.  They live in Florida.  They wanted to be here,

23 but they do live in Florida; they couldn't be here.  Mr.

24 Quiros has accepted his full responsibility for his actions

25 and is remorseful for the offenses and his conduct.

Colloquy

1    Now, to digress from that, to the man himself, I've

2    been representing Mr. Quiros for the, I'd say, fifteen years

3    I've known him.  I've represented him in two matters in

4    Superior Court in Connecticut, for which one time, he served

5    six months of incarceration.  Mr. Quiros was a very, very

6    serious -- and unfortunately dependent upon marijuana, to the

7    extent that he would be smoking ten to twelve big blunts a

8    day.  That may very well be one of the causes for his ailment

9    that he now has, which is described in the PSR, with respect

10   to his throat.

11   He quit doing that and was pretty much on the

12   straight and narrow, where he did start not only a clothing

13   business, but he also started a business dealing with

14   promotion of music.  And he was legitimately involved in that.

15   You will hear from Mr. Quiros himself today what

16   caused him to do what he did.  He's prepared to speak and

17   address the Court with respect to that.  But I can tell you

18   this man here, he has people here today who have come -- some

19   of his people -- his barbers who have been taking care of him

20   and his children, cutting their hairs.  They've known him for

21   more than ten years.

22   You saw the letter from Council (sic) Gomez, from the

23   Springfield Town Council, who Mr. Quiros has helped with

24   numerous occasions.  We didn't even solicit that letter.  That

25   letter came to my office late last evening.  That letter came

Colloquy

1  from Councilman Gomez.  He describes him as a person who's

2  always helpful.  And that's what I hear from -- helpful, he's

3  a kind, nice hearted person.  He's the kind of person who

4  would take his shirt off his back for you.

5          So long as I've known him, he's always been an

6  absolute gentleman.  He's offered to move things for me from

7  my office when I needed him to move -- if I needed that from

8  him.  He's just a nice, kindhearted individual.

9          What happened?  I don't know.  Mr. Quiros messed up.

10  We know that.  He digressed into a situation in which

11  people -- as Your Honor knows, many times, when you get

12  involved in the possession and distribution of narcotics, you

13  get greedy.  And the more successful you are with respect to

14  narcotics, the more greedy you become.  And the more greedy

15  you become, ultimately, it leads to your arrest.

16          And that's what happened to him.  He got caught.  He

17  got caught.  He didn't realize that during the time that he

18  got engaged in the distribution of these narcotics and in his

19  involvement with others, as Your Honor has -- there's numerous

20  defendants and codefendants in this matter -- and setting up

21  the stash house and places like that.

22          No one in this business thinks, there's going to come

23  a time where I'm going to get caught.  And there came a time,

24  probably now -- well, nineteen months ago, where he was

25  apprehended by the authorities, who had received search

Colloquy

1   warrants and warrants to track him, and track his phones, and

2   his conversations, unbeknownst to him.

3           And as he said to me, when I visited with him a

4   couple times at Wyatt, he is -- and I think he'll best

5   describe it as to him, he's had this illness now for quite

6   some time -- very concerned with the wellbeing of his

7   children -- all of his children.  He got -- some of this money

8   that he did get went to -- was to try to set them up for when

9   he passed away, which he believes he's going to pass away

10  fairly soon, if this is not treated.  It is a disease that is

11  ultimately fatal.  And you'll hear from him with respect to

12  that.

13          But he got caught and he knows what he did was

14  stupid.  Not only stupid, but it was dangerous.  Particularly

15  today and what's going on with the narcotics trafficking --

16  well, fortunately, there was no fentanyl involved in this.

17  But you never know when you're distributing narcotics when

18  fentanyl can be laced as well with the narcotics.  And it

19  could have led to things much more serious.  He's lucky to be

20  alive today because the kind of the people that he was dealing

21  with, you cross them, you have some serious, possibly

22  dangerous, situations that you can get yourself into.

23          THE COURT:  And that's not why he had the firearm?

24          MR. WOOLF:  He had a firearm, but he was never -- he

25  had a firearm.

Colloquy

1    THE COURT:  Right.

2    MR. WOOLF:  But the firearm was never used in

3    connection with the sale or the distribution of these

4    narcotics.  He had a firearm to protect himself, which he

5    never used.

6    THE COURT:  Because he was a drug dealer.  Or was

7    there some other reason why he needed protection?

8    MR. WOOLF:  Well, I'm assuming that was the

9    protection that he needed that for -- was he had a gun, as

10   many, many drug dealers do.  They have guns.  They don't use

11   it for offensive purposes; they use it for defensive purposes.

12   But he had it, but he never took it with him.  It was never

13   taken out of the place where it was located.  As a matter of

14   fact, it was never even fired.  He had it there as a backup.

15       But I don't want to overestimate the situation that

16   he was -- when he was involved in this business, I don't want

17   to overestimate the fact that he really was very concerned

18   about his life because he's -- he also had been because of

19   some of the people that he was dealing with.  But he had to

20   gun there as a safety tool.  That was it.  But he never used

21   it on the offensive of for aggressive purposes, nor did it

22   ever travel with him.  It was locked in the house.

23       The issue here -- one of the issues here today is

24   with respect to the plea agreement, and what was agreed to

25   between the Government and Mr. Quiros, and as to the

Colloquy

1  sentencing guideline calculation.  We know there's a minimum

2  mandatory of 10 to 120 months.  We know that.

3           I have to concur first with Attorney Paul that I'm

4  not sure that it should have been a two-point enhancement for

5  it.  However, notwithstanding that fact, the question is -- we

6  ask the Court to take into consideration that a departure is

7  warranted under Fernandez as well.  We ask the Court to take

8  into consideration what is the kind of punishment that this

9  Court wants to give that will be a deterrent to others, but

10  not greater than is necessary.

11           120 months is a long time, Your Honor.  It's ten

12  years of a person's life.  By the time that Mr. Quiros gets

13  out, the children that he has right now will be about ten

14  years older.  They will be out of his life.

15           As indicated on our memorandum on page 5, there are

16  two bases that warrant a downward departure.  First of all,

17  under United States sentencing guideline 5H1.4, based upon Mr.

18  Quiros' physical condition, which was the pemphigus vulgaris.

19  It's potentially life-threatening.

20           THE COURT:  Why is that an extraordinary condition

21  that warrants a downward departure?  Is there something about

22  the treatment of this potentially lethal condition that --

23           MR. WOOLF:  Yeah.

24           THE COURT:  -- is beyond the ability of the Bureau of

25  Prison to address?

Colloquy

1      MR. WOOLF:  Well, let me say it this way.  I don't

2  know that it's beyond the ability of the Bureau of Prison to

3  address, but I can tell you that while he was supposed to be

4  having his transfusions on a regular basis, and was having

5  these transfusions on a regular basis prior to incarceration,

6  in nineteen months -- and even despite my attempted

7  intervention while at Wyatt, he was only able to have it once.

8      THE COURT:  Why is that?

9      MR. WOOLF:  I don't know.  I was in touch with the

10  warden.  I was in touch with Medical.  I --

11      THE COURT:  They didn't explain to you?

12      MR. WOOLF:  All I used to get was a -- when I first

13  spoke with them, they told me that they were taking him to

14  Providence Hospital in Rhode Island to give him a transfusion.

15  It took a couple of months for them to get him there.  After

16  that, when his things started to exacerbate again, and he

17  started having a hard time breathing, and there were sores in

18  his mouth, I then again contacted the warden and then Medical.

19  I got a call back, saying, we're on top of it, we're

20  addressing it, we're going to be getting him into the hospital

21  for more treatment.  It never happened.

22      I'm hoping -- that's why we're going to be asking for

23  him to be designated to Devens, because of their medical

24  facilities.  I would hope that once he's in the full custody

25  of the Commissioner of the Bureau of Prisons, following

1    sentencing, imposition of sentence, that the Bureau of Prisons

2    will take note of this.  But if he doesn't get those

3    transfusions, which is necessary, it is not only life-

4    threatening, it is fatal.

5         The second departure downward is based on the United

6    States v. Mishoe, which the Court knows, memorandum aid of

7    sentencing at page 8 -- where the Second Circuit stated that

8    obviously a major -- and I quote, "Obviously, a major reason

9    for imposing an especially long sentence upon those who have

10   committed prior offenses is to achieve a deterrent effect that

11   prior punishments failed to achieve.  That reasons requires an

12   appropriate relationship between the sentence for the current

13   offense and the sentence"..."for the prior offenses."

14        He's only served, one time, a six-month sentence in

15   state prison, where he was at Hartford Correctional Center for

16   a conviction.  If my recollection serves me correctly, it was

17   Leicester J12 (ph.).  He had one other conviction, but he

18   never served any time.  And that was out of New Britain.

19        A below-guideline sentence serves the goal of

20   sentencing.  As is evident, the Court is required to recognize

21   the need for the sentencing imposed to reflect the seriousness

22   of the offense to promote respect for the law, to provide just

23   punishment for the offense.

24        For Mr. Quiros, the punitive purpose of sentencing

25   can be achieved, in this instance, with a below-guideline

Colloquy

1    sentence.  And what I mean by that is that while we don't

2    agree with the calculation that's done by Probation, we do

3    agree by the calculation as done by -- as we have done in

4    connection with our plea agreement that was entered into.  And

5    that would be the 121 months on the low end.

6        We believe that that 121 months is more than

7    sufficient to serve the purposes of a sentencing for Mr.

8    Quiros.  There is no reason to believe that a sentence in

9    excess of that will have any more of a detrimental effect upon

10   him.  As a matter of fact, the studies show that sentences

11   that are excessive do exactly the opposite and tend to cause

12   reviolations by individuals who are incarcerated and

13   recidivism much more than sentences that are within a range

14   that the Court can impose on the lower end.

15       We have provided the Court with redacted copies of

16   his medical records.  I actually have copies of his medical

17   records here, which are unredacted, which I'm going to ask the

18   Court if they would submit them.  If I could give it to the

19   Court, so that those records, unredacted, could be submitted

20   to the Bureau of Prisons.  I believe the Bureau of Prison is

21   going to need to have those reports.  And I have them here for

22   the Court.

23       And I would like, at this point in time, to ask a

24   couple of people to address the Court on behalf of Mr. Quiros

25   and have Mr. Quiros address the Court himself.  And I think

Colloquy

1    the Court will be surprised at the candor in which he will --

2    in which he will address the Court.  And I would hope that the

3    Court will take into consideration everything we've stated in

4    our memorandum of aid in sentencing (sic), take into

5    consideration the pela agreement, as agreed to between the

6    Government and Mr. Quiros.

7         This man is not a monster, by any stretch of the

8    imagination.  He understands that he messed up.  There's no

9    question.  His family understands that he messed up.  He did,

10   but I think that the guideline range for which was calculated

11   in the plea agreement, and the lower end of the guideline

12   range being 121 months, is more than sufficient than is

13   necessary to be imposed upon this defendant in this particular

14   matter.  And I ask the Court to hold off its decision on that

15   until it's heard from the others, as well as from Mr. Quiros

16   himself.

17        THE COURT:  Certainly.

18        MR. WOOLF:  Thank you very much.

19        THE COURT:  You're welcome.

20        MR. WOOLF:  I'm going to ask --

21        THE COURT:  The podium, ma'am.  Come forward to the

22   podium, please.

23        Thank you.

24        MS. CASTRO:  Right here?

25        THE COURT:  Yes.

Colloquy

1          MR. HALL:  Right where you were.

2          MR. WOOLF:  Right there.

3          THE COURT:  To the podium.

4          Do you see the mic there?  You can adjust that.

5          MS. CASTRO:  Thank you.  Thank you for the

6     opportunity that you're giving me today for stand here (sic),

7     Your Honor.

8          I would like to -- to start to -- here, to be

9     available to share with you, in this court, a great person,

10    Orlando Quiros.  He has been put into -- into this test in

11    life, where it's affecting not only him, but my family and

12    myself.  We miss Orlando at home.  He has been a good husband,

13    fantastic father, son, brother, uncle, and friend.  My kids

14    are very sad and miss Orlando on holidays.

15         I can also say that it's been hard for me.  On days

16    when my kids are sick and doctor appointments, Orlando used to

17    be the person I can count on, always make sure I have help,

18    and made medicines for my kids.  Besides the situation, I can

19    assure to this Court that he's a very lovable person and

20    responsible.  And again, as a father, he's the best.  I could

21    never ask for a better father to my kids.  And as a person to

22    all -- he's always a helpful person, no matter how bad the

23    situation was.  And overall, saying, he's a great-hearted

24    person, that he's been missed.

25              Thank you.

Colloquy

1        I just want to say Orlando, to my husband, happy

2    anniversary.  It's today.

3        Thank you.

4        THE COURT:  You're welcome.

5        MR. WOOLF:  I did omit to indicate one thing, Your

6    Honor, thank you.  There are certain -- as was indicated in

7    the memorandum of aid in sentencing, he's been a model inmate.

8        THE COURT:  Yes.  I've read that.

9        MR. WOOLF:  Okay.  Not only has he been a model

10   inmate, but he's been helpful to people in there.  He has gone

11   to courses.  I have certificates of completion.

12       THE COURT:  I've read that in the PSR.

13       MR. WOOLF:  Okay.  And there's a bunch of

14   certificates that I have here.  I have a number of those.  So

15   I just wish to bring those to the Court's attention.

16       THE COURT:  And in your sentencing memo as well.

17       MR. WOOLF:  Thank you very much, Your Honor.

18       THE COURT:  You're welcome.

19       MR. WOOLF:  J.Q., his son.

20       J.Q.:  Hi.  I'm J.Q.  I'm the oldest son.  I had a

21   letter, but I didn't bring it with me.  And honestly, I wasn't

22   prepared to speak here today.

23       But my father -- as far as he's -- I've known him my

24   entire life.  He's been with me, with my brothers, he's been

25   the most important person to me, by far.  He's always helped

Colloquy

1    us.  He's always helped anyone.

2         I honestly didn't know any of the dealings that he

3    did.  It's -- whether it be ignorance, blindness by how kind

4    and how helpful he was with my family, he didn't bring any of

5    it home with us.  He was always just there for me and my

6    family, just loving, supportive, caring.  Honestly, I miss him

7    every day.  The illness is not helpful to deal with now that

8    he's not around either.  It's really rough for me and my

9    family.

10        I just want to say to him, as well as to the Court, I

11   am proud to be his son, regardless of the horrible things he

12   might have done, the bad things; he did mess up.  It's not an

13   excuse, but I do love him and I'm proud to be the son that I

14   am today.

15        Thank you.

16        THE COURT:  You're welcome.

17        MR. WOOLF:  Mr. Quiros would like to address the

18   Court, too, Your Honor.

19        THE COURT:  Certainly.

20        MR. WOOLF:  Do you wish him to go to the podium or --

21        THE COURT:  No, no.  He can use the microphone there

22   at the table.

23        THE DEFENDANT:  Your Honor, I want to first thank the

24   Court for giving me the opportunity to apologize, not only to

25   the Court and to the Government, but also to my family,

Colloquy

1    especially my children.

2           As I sat in jail, thinking about my life and this

3    case, I can clearly identify the point where I took this

4    terrible detour, which ends up -- which ended up bringing me

5    face-to-face with what I most fear, separation from my family.

6    I simply ask that everybody, including Your Honor, understand

7    that I'm not using this an excuse, but simply so that you may

8    understand what drove me to this point.

9           Four years ago, after more than a decade of not

10   getting into trouble with the law, I was diagnosed with a

11   rare, incurable disease, pemphigus vulgaris.  This was the

12   point where my world crumbled.  Knowing that I can die at any

13   moment changed my whole outlook on life, thinking about, what

14   if one day I don't wake up.  This is like living a death -- on

15   death row, every day, waiting -- waiting and expecting for

16   your time to summon me for execution.  This is the reason I

17   didn't plead guilty earlier, because my lawyers thought the

18   Government's agreement to a lower -- to a lower mandatory

19   minimum to give me a fighting chance to not die in prison.

20          Since that day, I live constantly with the worry that

21   before I die, I have to leave my family and children a legacy

22   and memories to remember -- to remember me by, and sufficient

23   funds for their life and education.  There -- they was a

24   blessing to wake up, but a curse to go to sleep, worrying that

25   tomorrow would be the day I would not wake up.

Colloquy

1    I admit that I did wrong, Your Honor.  And the fact

2   that I thought I was doing it for the right reasons makes me

3   more -- feel more -- even more worse since I brought up myself

4   what I most fear.  That which I sought to avoid is what I

5   caused to happen, separation from my family.  So I fully

6   understand the seriousness of my actions.  And I know I have

7   to be punished.  I just wanted to submit my children with

8   memories, with acknowledging that I was a good father, and

9   that I love them.  I just wanted to enjoy whatever time I had

10   left with my family.

11    I know I'm not perfect, Your Honor.  And I'm not

12   justifying the ends with the means, but I'm not a bad person.

13   But now I'm getting a sentence of probably more than ten years

14   of confinement.  It's like a death -- death sentence within a

15   death sentence.  I feel like I'm being punished twice, with my

16   sickness and for trying to provide a better life for my family

17   before I die.  However, I would have known what I know now,

18   I'd rather have been working at a gas station for three

19   dollars an hour, just to be with my family.

20    I lost everything and I don't care about what I lost.

21   What I really care about is all the time I'm going to lose

22   with my family, to then come home, if I make it home before my

23   disease takes its toll on me, and try to pick up the pieces.

24   I just wish and hope I can get a second chance and be able to

25   make it home and make things right again the right way, to

Colloquy

1   show my kids to fight through life's adversities the right

2   way, to give them an example of perseverance despite

3   circumstances, to live with the example that love conquers

4   all.

5        I know I made the wrong decisions and I'm the one to

6   blame.  Trust me, Your Honor, if I had to do it over again, I

7   would do everything so much different, and not only because I

8   got caught, but because of how ashamed I feel that I put my

9   family and children through all this.  They are my life, Your

10  Honor.  Every -- every moment I'm apart from them hurts me.

11  No words can describe -- can describe, especially thinking

12  that because of my disease, I very well not make it home to

13  them.  For this, I honestly feel like this would be a death

14  sentence handed down on me today.  This is why I'd like to

15  briefly address my children at this time and apologize to them

16  and the rest of my family.

17        To my sons, J.Q., S.Q. (ph.), A.C., and N.Q. (ph.),

18  I'm sorry for letting you guys down.  Right -- right now, time

19  is my worst enemy because this is time I can never give back

20  to you guys.  Sorry that I won't be there for you when you

21  really need me to talk to you about the things that only a

22  father can talk to his boys about.  Sorry for not -- sorry for

23  not being able to be there for your football games like I used

24  to.  Sorry for missing out on your graduation.  But most of

25  all, sorry that I won't be there to guide you in making the

Colloquy

1  right decisions.  I'm truly going to miss all of you, all the

2  moments that we had.

3          To J.Q., you're my oldest, so please look after your

4  brothers.  Always look for them, and try to always keep the

5  love amongst each other, and always be a good role model for

6  them.

7          To S.Q., keep doing good in school and keep doing

8  good in football.  I know you're going to be great in life.

9  And like I tell you over the phone, I may not be watching -- I

10  may not be there watching you, but I'm in your hearts, always,

11  watching over all of you.

12          To A.C., be a good boy and help your mom with

13  everything that you can and always watch over your little

14  brother because he's really going to need you now that I'm not

15  going to be around for a little while.

16          And to my baby boy, N.Q., I need you to listen to

17  everything your mom tells you to do and help her with anything

18  she needs help around the house.

19          You are all uniquely special.  And I love you all

20  infinity times infinity.  Never forget that.  Now hold onto

21  all our memories because that's all we have left.  No one can

22  take that from us.

23          To my kids' mothers, I want to thank you for all your

24  support, but most importantly, for being the great mothers

25  that you are to our children.  I simply ask that you please

Colloquy

1    keep my children in each other's lives.  I'm sorry that I've

2    put you in the position of raising boys into men without me.

3    I know you both can because you're both strong, independent,

4    and hardworking women.  I'm just sorry that I let my

5    circumstances drive my decisions and now I can't be present in

6    my children's lives.  Because of what I know of you both, I

7    have faith that you will raise my kids to be the men that I

8    have always wanted them to be.  Raise them to be respectful,

9    lovable, strong, honorable, and most of all, humble, like

10   their father.  You of all people know my heart and know how

11   much my kids mean to me.  So please take care of them and

12   always remind them about how much I love them.  From the

13   bottom of my heart, thank you for all you do for our children.

14           I know my parents are not here, but I still want to

15   apologize to them because I know I let them down.  I know how

16   very much disappointed they are in me because I know how

17   disappointed I am in myself because of all this.

18           Your Honor, before I conclude, I want you to know I

19   never told any of this about my disease to my children because

20   I didn't want them to suffer and worry about whether they

21   would lose me to this disease.  I just wanted what any parent

22   wants, for my children to enjoy their growing years without

23   worrying about grownup problems.  I know my children have

24   (indiscernible) and for that, I'm truly sorry.

25           Thank you for allowing me to take so much time of the

Colloquy

1    Court, Your Honor.  Thank you.

2         THE COURT:  Attorney Woolf, anything further?

3         MR. WOOLF:  Nothing further, Your Honor.

4         THE COURT:  In determining the appropriate sentence

5    to impose, the Court must consider the 3553 factors.  The

6    Court must consider the nature and circumstances of the

7    offense.  Obviously, this is a very serious offense.  The

8    distribution of drugs is dangerous for all involved.  Even the

9    defendant acknowledges that his conduct was so dangerous that

10   he needed to possess a Magnum in order to protect himself.

11        But the nature and circumstances of the offense go

12   beyond the effect that it has on the defendant and his

13   children, whose concerns we've heard so much about here today.

14   The reason we have laws is to protect the public.  The people

15   to whom those drugs are sold, who become addicts and don't go

16   to their children's football games aren't able to be good

17   fathers to their children, squander their financial resources

18   on illicit drugs that make them sick, that could be lethal to

19   them.

20        And why?  Because of the history and characteristics

21   of the defendant, a multiple drug convict, who chose to poison

22   others for his own financial gain.

23        And to what end?  If I'm to believe his financial

24   statement, he has no assets and no liabilities.  It strains

25   credulity to believe that Mr. Quiros engaged in this activity

Colloquy

1    to provide for his family in anticipation of his untimely

2    death, when there's absolutely nothing to show for it:  no

3    assets and no liabilities.

4          I've read the transcripts of the wiretap

5    communications.  I hear no anguish, I hear no concern for Mr.

6    Quiros' physical well-being.  What I hear is the sounds of an

7    individual who is grandiose and who enjoys what he's doing,

8    consistent with an individual that tools around town in a

9    Mareserati (sic) or in a BMW, a person who is engaging in

10   criminal conduct that injures other people simply for his own

11   personal gain, benefit, and enjoyment, and that of those he

12   cares about, without regard to anyone else.

13         The sentence must be imposed to protect the public

14   against such a pernicious person, who would sacrifice others

15   for their own petty financial gain, to deter not only the

16   defendant, but others, from engaging in criminal conduct.  And

17   when one drives around in a relatively impoverished community

18   in a Maserati and a BMW, what signal does that send to all the

19   other people in that community, to the young people who look

20   up at the Maserati driver and want to do what that person

21   does, so that they too may live a lavish lifestyle?

22         What does that say to the hardworking father, who

23   does work at a gas station for three dollars an hour, and has

24   great experiences with his family, day after day, year after

25   year, with no threat of incarceration?  Does that image of the

1    Maserati make him question whether he has chosen the right

2    course?  Does it demean him in the eyes of his children

3    because he's not driving around in a Maserati or a BMW?  This

4    conduct infects the community in so many, so many ways.  And

5    others need to be deterred from following in Mr. Quiros'

6    footsteps, following the example of a lavish lifestyle that he

7    presented to the public with those vehicles.

8            The Court must consider the defendant's educational

9    and vocational needs, and corrective medical care needs.  And

10   certainly, the Bureau of Prisons is equipped to handle Mr.

11   Quiros' medical conditions.  I've heard nothing -- the defense

12   has presented nothing that would suggest that they are not.

13   And certainly, other people with even more serious conditions

14   have been sentenced to terms of imprisonment.

15           The Court must consider the kinds of sentences

16   available and those recommended by the United States

17   Sentencing Commission in the guidelines.  The guidelines are

18   not mandatory; they are advisory.  The Court must calculate

19   the recommended guideline sentence and take that into

20   consideration in determining the sentence, which is

21   sufficient, but not greater than necessary to fulfill the

22   purposes of sentencing.

23           The Court agrees with the probation officer's

24   calculation of the offense level, as the defendant has posited

25   no reason why he would own a Magnum firearm, other than

Colloquy

1   because he was engaging in illegal drug trafficking.  And

2   therefore, that firearm was being used by him to protect --

3   was held by him for the purpose of protecting himself and his

4   family from the dangers inherent in his conduct.

5           That having been said, the Government negotiated with

6   the defense a sentence based upon the stipulation that did not

7   include that increase.  And the Court will cede to the

8   parties' stipulation, under United States v. Fernandez.

9           The Court therefore adopts the guideline calculation

10  in the parties' plea agreement, resulting in a total offense

11  level of thirty-one, criminal history category II, and a

12  recommended guideline sentence of 121 to 151 months with 120-

13  month mandatory minimum, a five-year period of supervised

14  release, fine of 50,000 to 5 million dollars -- excuse me,

15  30,000 to 5 million dollars, and the 100-dollar special

16  assessment.

17          Taking into consideration all of the 3553 factors and

18  the entirety of the record, the Court concludes that the

19  following sentence is sufficient, but not greater than

20  necessary to fulfill the purposes of sentencing.  And I would

21  note that in view of the defendant's statement as to why he

22  engaged in this conduct, the amount of money that he

23  apparently made and certainly possessed, in connection with

24  this drug trafficking, the Court believes that the defendant

25  has not fully and honestly disclosed his financial position.

Colloquy

1         Would you stand for sentencing, please?

2         You're hereby committed to the care and custody of

3 the Bureau of Prisons for a period of 136 months.  That

4 sentence is to be followed by a five-year period of supervised

5 release.  During the period of supervised release, you shall

6 be subject to the standard conditions and the mandatory

7 conditions.

8         The Court would like to note that you may not commit

9 any other state, federal, or local offense.  You shall

10 cooperate with the collection of your DNA sample.  You may not

11 possess a firearm, dangerous weapon, or ammunition.  You may

12 not illegally use or possess a controlled substance.  You

13 shall be subject to the following special conditions:  your

14 home, your person, your vehicle, and your place of employment

15 shall be subject to search on reasonable suspicion by the

16 probation office, and if they deem appropriate, with the

17 protective assistance of the police.

18         You shall submit to random drug screening, the first

19 to be within fifteen days of your release of custody, and at

20 least twice per year thereafter.  You shall submit to

21 substance abuse and mental health evaluations, and participate

22 in treatment on an outpatient basis, as directed by the Office

23 of Probation, and on an inpatient basis by order of the Court.

24         You shall obtain and maintain full-time legal

25 employment and you will be required to report monthly -- at

Colloquy

1    least monthly -- to probation, which would include your

2    submission of pay stubs showing your full-time legal

3    employment.  Should you not be employed fully and in a legal

4    occupation, any time between the hours -- average hours per

5    week that you are so engaged and forty hours per week, you

6    shall be engaged in vocational training, education, or

7    community service, for a total of forty hours per week.

8         The Court orders you to pay the one-hundred-dollar

9    special assessment.  And the Court reluctantly will not impose

10   a fine because I can't even conceive of what the amount of

11   fine I would impose would be reasonable, in light of your

12   failure to fully disclose your financial position.

13        MR. WOOLF:  Could we ask that the special assessment

14   be taken out of his commissary, please?

15        THE COURT:  I don't think I have authority to --

16        MR. WOOLF:  I believe, Your Honor --

17        THE COURT:  -- withdraw money from his commissary.

18        MR. WOOLF:  I believe that Your Honor does.  I just

19   had it in front of Judge Thompson, just not that long ago.

20        THE COURT:  The Court orders withdrawal of money from

21   his commissary?

22        MR. WOOLF:  You can order the clerk to take the money

23   out of his commissary, correct.

24        THE COURT:  I know that we do that for payment of

25   filing fees, but I've never been asked to do that to pay the

Colloquy

1  special assessment.

2          MR. WOOLF:  That's my understanding.

3          THE COURT:  Why is that necessary?

4          MR. WOOLF:  Because there's no way to --

5          THE DEFENDANT:  I already have it there, Your Honor.

6          THE COURT:  How much do you have in your commissary

7  account?

8          THE DEFENDANT:  A hundred dollars.

9          THE COURT:  Is that all you have in your commissary

10  account?

11          THE DEFENDANT:  I think I have a little bit more.

12          THE COURT:  How much do you have in your commissary

13  account?

14          THE DEFENDANT:  I don't remember.  I can't recall

15  right now, because I used -- I bought some food yesterday and

16  I used some for the phone the other day, too, so probably

17  close to 200 dollars.

18          THE COURT:  Where did the money in your commissary

19  account come from?

20          THE DEFENDANT:  From friends and my mom -- my mom and

21  my girl.

22          THE COURT:  Okay.  Well, maybe your girl can pay your

23  hundred-dollar special assessment.

24          The Court recommends that the defendant be housed in

25  a medical facility --

Colloquy

1    MR. WOOLF:  We're asking for Devens FCI as a

2   recommendation for designation, Your Honor.

3    THE COURT:  The Court recommends that the defendant

4   be housed in a medical facility with the capacity to handle

5   the specific physical condition he has.  And I would ask that

6   you provide that documentation -- I think it goes to the U.S.

7   Marshal Service.  I don't believe it's filed with the Court.

8    MR. WOOLF:  Okay, Your Honor.

9    THE COURT:  Okay?

10    I want to make sure that Mr. Quiros gets the best

11   care he needs, not the nearest care available, in light of the

12   severity of the condition, as he believes it to be.

13    Now, Mr. Quiros, should you use choose to appeal the

14   sentence imposed by the Court, you have to do so within

15   fourteen days of the date of the written judgment.  You can do

16   that by contacting Attorney Woolf.  If he is no longer

17   representing you or refuses to file that appeal, you may

18   contact the clerk of the court.  The clerk of the court will

19   provide you with paperwork with which to file the appeal, but

20   you must file it within fourteen days of the date of the

21   judgment.  If you cannot afford an attorney, an attorney will

22   be appointed to represent you, at public expense, for an

23   appeal.

24    I'm advising you of the deadline by which you must

25   file an appeal, the manner in which you can file an appeal,

Colloquy

1    and the fact that you're entitled to an attorney, should you

2    choose to appeal, not because I believe you have any right to

3    appeal.  Indeed, I believe that the Court's sentence is both

4    procedurally and substantively proper and legal.  But I am

5    required by law to advise you of those things.  And I have

6    discharged my responsibility in so doing.

7              Is there any objection to the sentence as imposed?

8              MR. HALL:  I don't have an objection, Your Honor, but

9    I think it was -- Mr. Quiros was also -- entered a plea of

10   guilty to Count V, so I assume the Court is sentencing him to

11   the same sentence on Count V to run concurrent?

12             THE COURT:  That's correct.

13             MR. HALL:  Thank you.

14             THE COURT:  You're welcome.

15             MR. HALL:  And then as I mentioned at the beginning,

16   I would move the Court for an order of forfeiture as to the

17   weapon that I described at the beginning of the proceeding.

18   And I will file a paper motion, but I want to get that in

19   front of you today in connection with the sentence.

20             THE COURT:  Yes.  The Court grants the Government's

21   oral motion for forfeiture of the Magnum firearm that was

22   discussed here at the proceedings today.

23             MR. HALL:  Thank you.

24             THE COURT:  You're welcome.

25             Mr. Woolf?

Colloquy

1        MR. WOOLF:  Nothing further, Your Honor.

2        THE COURT:  Thank you.

3        THE CLERK:  Do we have counts to dismiss, Your

4    Honor -- counts to dismiss?

5        THE COURT:  Yes, do you have counts to dismiss?

6        MR. HALL:  I'm sorry?

7        THE COURT:  You have counts to dismiss?

8        MR. HALL:  Oh, I'm sorry.  Yes, I do, Your Honor.

9        The Government would move the Court to dismiss the

10   original indictment as it pertains to Mr. Quiros, as well as

11   Counts II through IV, and VI, and VII of the superseded

12   indictment.

13       THE COURT:  Those counts are dismissed.

14       MR. HALL:  Thank you.

15       THE COURT:  You're welcome.

16       THE CLERK:  All rise.  The Honorable United States

17   District Court is now in recess.

18       (Whereupon the above matter was concluded at 2:37

19   o'clock, p.m.)

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3          I, Sara Bernstein, Official Court Transcriber for the

4    United States District Court for the District of Connecticut,

5    do hereby certify that the foregoing pages are a true and

6    accurate transcription of the proceedings in the

7    aforementioned matter to the best of my skill and ability.

8

9

10   Date: July 22, 2019

11

12

13

14   _____

15          SARA BERNSTEIN, CDLT-127

16          eScribers, LLC
          352 Seventh Avenue, Ste. #604
17          New York, NY 10001
          (973)406-2250
18          operations@escribers.net

19

20

21

22

23

24

25

## A

**ability (2)**
30:24;31:2
**able (7)**
8:3;10:7;11:22;31:7;
39:24;40:23;43:16
**above (1)**
52:18
**absolute (1)**
27:6
**absolutely (1)**
44:2
**abuse (1)**
47:21
**AC (4)**
5:6,14;40:17;41:12
**accepted (1)**
25:24
**access (3)**
10:10;12:22;21:18
**account (5)**
12:22;49:7,10,13,19
**accountant (1)**
14:22
**accurate (4)**
9:12;16:11,12,13
**achieve (2)**
32:10,11
**achieved (1)**
32:25
**acknowledges (1)**
43:9
**acknowledging (1)**
39:8
**actions (2)**
25:24;39:6
**activity (4)**
7:8,8;10:8;43:25
**actually (3)**
14:6;20:11;33:16
**Acura (2)**
8:18;19:16
**add (1)**
5:11
**added (1)**
5:5
**addicts (1)**
43:15
**addition (2)**
7:11;19:23
**additional (1)**
24:25
**address (11)**
13:11;18:8,8;26:17;
30:25;31:3;33:24,25;
34:2;37:17;40:15
**addressed (1)**
13:10
**addressing (1)**
31:20
**adequately (1)**
18:9
**adjust (1)**
35:4
**Administration (1)**
3:11
**administratively (2)**
8:15,23
**admit (1)**
39:1
**adopts (2)**
5:23;46:9
**adversities (1)**
40:1
**advise (1)**
51:5
**advised (2)**
4:7;14:1
**advising (1)**
50:24
**advisory (1)**
45:18
**affecting (1)**
35:11
**affidavit (5)**
16:10;18:22,24;
21:19;22:4
**afford (1)**
50:21
**afternoon (6)**
3:5,8,12,13;6:2;7:22
**again (7)**
11:15;18:22;31:16,
18;35:20;39:25;40:6
**against (1)**
44:14
**Agent (1)**
3:9
**agents (1)**
13:6
**aggressive (1)**
29:21
**ago (3)**
27:24;38:9;48:19
**agree (2)**
33:2,3
**agreed (6)**
6:19;9:13,17;20:15;
29:24;34:5
**agreement (9)**
6:20;7:18,19;29:24;
33:4;34:5,11;38:18;
46:10
**agrees (1)**
45:23
**Ah (2)**
12:15;22:20
**aid (5)**
25:13,14;32:6;34:4;
36:7
**ailment (1)**
26:8
**alive (1)**
28:20

**allowing (1)**
42:25
**alluding (1)**
19:4
**almost (1)**
23:9
**Although (1)**
10:9
**always (14)**
27:2,5;35:17,22;
36:25;37:1,5;41:4,4,5,
10,13;42:8,12
**amend (1)**
5:11
**ammunition (2)**
7:25;47:11
**among (1)**
11:22
**amongst (1)**
41:5
**amount (5)**
11:7;16:3;17:17;
46:22;48:10
**anguish (1)**
44:5
**anniversary (1)**
36:2
**anticipation (1)**
44:1
**apart (1)**
40:10
**Apartment (1)**
8:2
**apologize (3)**
37:24;40:15;42:15
**apparently (2)**
16:3;46:23
**appeal (8)**
50:13,17,19,23,25,
25;51:2,3
**appearance (1)**
21:11
**appearances (1)**
3:6
**application (1)**
7:1
**appointed (2)**
9:24;50:22
**appointments (1)**
35:16
**apprehended (3)**
16:4,19;27:25
**appropriate (3)**
32:12;43:4;47:16
**approximately (4)**
8:16;11:23;17:25;
20:10
**area (4)**
10:1,23;11:15;13:24
**around (7)**
14:8;37:8;41:15,18;
44:8;17;45:3
**arrest (4)**

10:17;17:24;19:22;
27:15
**arrests (2)**
8:3;11:13
**ashamed (1)**
40:8
**aspect (1)**
21:8
**assent (1)**
3:17
**assessment (5)**
46:16;48:9,13;49:1,
23
**Asset (3)**
9:15;21:11;22:25
**asset-forfeiture (1)**
21:7
**assets (7)**
8:14,21;23:15;24:1,
10;43:24;44:3
**assist (1)**
13:23
**assistance (1)**
47:17
**assisted (1)**
3:16
**assisting (2)**
25:2,4
**assume (1)**
51:10
**assuming (1)**
29:8
**assure (1)**
35:19
**ATF (1)**
8:13
**attempted (1)**
31:6
**attempting (1)**
12:20
**attention (3)**
5:18;13:15;36:15
**Attorney (11)**
3:13,15;6:10;9:17;
19:3;30:3;43:2;50:16,
21,21;51:1
**Attorney's (1)**
9:16
**auction (1)**
21:25
**auctioned (1)**
21:23
**authorities (1)**
27:25
**authority (1)**
48:15
**automobile (1)**
8:16
**available (4)**
9:9;35:9;45:16;
50:11
**average (1)**
48:4

**avoid (1)**
39:4
**aware (4)**
6:17;7:5,12;11:14
**away (2)**
28:9,9

## B

**baby (1)**
41:16
**back (6)**
10:18;23:6,11;27:4;
31:19;40:19
**backup (1)**
29:14
**bad (3)**
35:22;37:12;39:12
**balance (3)**
22:6,21,24
**bank (1)**
12:8;21:24;24:15
**bar (1)**
3:16
**barbers (1)**
26:19
**based (5)**
11:14;19:25;30:17;
32:5;46:6
**bases (2)**
30:16
**basically (2)**
8:21;21:4
**basis (4)**
31:4,5;47:22,23
**bear (1)**
6:4
**bearing (1)**
7:24
**become (4)**
8:14;27:14,15;43:15
**beginning (2)**
51:15,17
**behalf (2)**
3:14;33:24
**believes (3)**
28:9;46:24;50:12
**below-guideline (2)**
32:19,25
**benefit (1)**
44:11
**benefitted (1)**
24:1
**Bernice (2)**
5:7;24:6
**Besides (1)**
35:18
**best (3)**
28:4;35:20;50:10
**better (2)**
35:21;39:16
**beyond (3)**
30:24;31:2;43:12

**big (1)**
26:7
**Birckhead (2)**
3:15,22
**bit (2)**
10:19;49:11
**blame (1)**
40:6
**blessing (1)**
38:24
**blindness (1)**
37:3
**blunts (1)**
26:7
**BMW (5)**
19:18;22:14;44:9,18;
45:3
**born (3)**
24:25,25;25:1
**borrowed (3)**
20:11;21:3,4
**both (6)**
11:8;20:9;42:3,3,6;
51:3
**bottom (1)**
42:13
**bought (1)**
49:15
**Boulevard (1)**
8:1
**boy (2)**
41:12,16
**boys (2)**
40:22;42:2
**breathing (1)**
31:17
**Brenda (1)**
24:4
**Brian (1)**
3:14
**briefly (1)**
40:15
**bring (6)**
10:21;13:13;15:12;
36:15,21;37:4
**bringing (1)**
38:4
**Britain (1)**
32:18
**brother (2)**
35:13;41:14
**brothers (2)**
36:24;41:4
**brought (5)**
5:18;12:6,8;17:14;
39:3
**bunch (2)**
15:12;36:13
**burden (1)**
6:4
**Bureau (9)**
5:25;30:24;31:2,25;
32:1;33:20,20;45:10;

47:3
**business (15)**
7:9,10;10:6,8,11,11;
11:25;12:4;13:19,23;
14:4;26:13,13;27:22;
29:16

**C**

**calculate (2)**
16:3;45:18
**calculated (1)**
34:10
**calculation (5)**
30:1;33:2,3;45:24;
46:9
**caliber (1)**
7:25
**call (2)**
18:1;31:19
**came (3)**
26:25,25;27:23
**Cameron (1)**
3:10
**can (30)**
13:19;15:23;18:14;
21:15,19;26:17;28:18,
22;31:3;32:25;33:14;
35:4,15,17,18;37:21;
38:3,12;39:24;40:11,
11,19,22;41:13,21;
42:3;48:22;49:22;
50:15,25
**candor (1)**
34:1
**capacity (1)**
50:4
**car (6)**
8:20;9:8;19:17,18,
18;21:22
**cards (1)**
23:1
**care (8)**
26:19;39:20,21;
42:11;45:9;47:2;50:11,
11
**cares (1)**
44:12
**caring (1)**
37:6
**cars (1)**
19:13
**case (12)**
3:4;5:23;6:17,19;
7:5;8:3;10:17;11:1,10,
14;19:22;38:3
**cases (1)**
6:18
**Castiglione (1)**
3:10
**Castro (11)**
5:7;23:23;24:5,6,7,
14,16,25;25:1;34:24;

35:5
**category (1)**
46:11
**caught (5)**
27:16,17,23;28:13;
40:8
**cause (1)**
33:11
**caused (2)**
26:16;39:5
**causes (1)**
26:8
**cede (1)**
46:7
**Center (1)**
32:15
**certain (1)**
36:6
**Certainly (8)**
3:19;12:8;13:13;
34:17;37:19;45:10,13;
46:23
**certificates (2)**
36:11,14
**chance (4)**
15:13;18:21;38:19;
39:24
**changed (1)**
38:13
**characteristics (1)**
43:20
**charging (2)**
4:3,4
**child (6)**
5:8,12;24:6,18,24,25
**children (24)**
5:8;24:4,5,20;25:1,5;
26:20;28:7,7;30:13;
38:1,21;39:7;40:9,15;
41:25;42:1,13,19,22,
23;43:13,17;45:2
**children's (2)**
42:6;43:16
**choose (3)**
8:8;50:13;51:2
**choosing (1)**
21:21
**chose (1)**
43:21
**chosen (1)**
45:1
**Circuit (1)**
32:7
**circumstances (5)**
7:13;40:3;42:5;43:6,
11
**Civil (1)**
9:15
**clear (2)**
11:2;12:2
**clearly (2)**
15:23;38:3
**CLERK (8)**

3:2;18:16,19;48:22;
50:18,18;52:3,16
**client (4)**
9:6;14:2;18:10;19:1
**close (1)**
49:17
**closer (1)**
22:12
**clothing (1)**
26:12
**cocaine (6)**
10:25;12:12,23;13:1;
19:25;20:3
**codefendants (1)**
27:20
**collection (1)**
47:10
**Collette (2)**
3:24;5:13
**combined (1)**
24:10
**coming (1)**
15:15
**commissary (8)**
48:14,17,21,23;49:6,
9,12,18
**Commission (1)**
45:17
**Commissioner (1)**
31:25
**commit (1)**
47:8
**committed (2)**
32:10;47:2
**communications (3)**
10:3;17:4;44:5
**community (4)**
44:17,19;45:4;48:7
**company (2)**
21:24;23:6
**completion (1)**
36:11
**complicated (1)**
24:3
**complied (1)**
16:5
**computer (2)**
7:22;8:4
**conceive (1)**
48:10
**concern (1)**
44:5
**concerned (2)**
28:6;29:17
**concerning (1)**
18:6
**concerns (1)**
43:13
**concert (1)**
10:5
**conclude (1)**
42:18
**concluded (1)**

52:18
**concludes (1)**
46:18
**concur (1)**
30:3
**concurrent (1)**
51:11
**condition (5)**
30:18,20,22;50:5,12
**conditions (5)**
45:11,13;47:6,7,13
**conduct (9)**
4:8;7:4;25:25;43:9;
44:10,16;45:4;46:4,22
**confinement (1)**
39:14
**confused (1)**
17:13
**confusion (1)**
17:12
**Connecticut (3)**
3:16;16:23;26:4
**connection (7)**
7:3,9;11:21;29:3;
33:4;46:23;51:19
**Connex (1)**
22:21
**conquers (1)**
40:3
**consider (4)**
43:5,6;45:8,15
**consideration (6)**
30:6,8;34:3,5;45:20;
46:17
**consistent (1)**
44:8
**conspiracy (1)**
4:4
**constantly (1)**
38:20
**contact (1)**
50:18
**contacted (2)**
9:15;31:18
**contacting (1)**
50:16
**contested (1)**
9:21
**control (1)**
19:12
**controlled (2)**
4:6;47:12
**conversation (2)**
11:2,4
**conversations (1)**
28:2
**convict (1)**
43:21
**conviction (2)**
32:16,17
**cooperate (1)**
47:10
**copies (2)**

33:15,16
**Correctional (1)**
32:15
**corrective (1)**
45:9
**correctly (1)**
32:16
**Council (2)**
26:22,23
**Councilman (1)**
27:1
**counsel (3)**
3:18;4:11,18
**count (4)**
7:13;35:17;51:10,11
**counted (1)**
17:18
**counter (2)**
11:9,9
**counts (7)**
4:2;52:3,4,5,7,11,13
**couple (3)**
28:4;31:15;33:24
**course (5)**
9:5;19:25;21:18,20;
45:2
**courses (1)**
36:11
**Court (210)**
3:3,5,12,18,19,21,23;
4:10,13,15,18,21,23;
5:4,10,10,16,20,23,23;
6:6,9,16;7:4,17;8:9;
9:1,10,19,20,23;10:2,
13,14;12:2,15,17,25;
13:3,5,7,11,13,15;
14:10,13,16,19,24;
15:1,4,6,14,16,19,23;
16:5,7,8,11,14,20,25;
17:3,6,10,23;18:3,11,
14,17,20,21,25;19:2,5,
7,9,15,20;20:7,9,13,17,
20,22,25;21:2,6,9,15;
22:1,5,8,10,13,17,20,
23;23:2,8,12,14,18,22,
25;24:7,10,12,16,20,
23;25:4,7,9,11;26:4,17;
28:23;29:1,6;30:6,7,9,
20,24;31:8,11;32:6,20;
33:14,15,18,19,22,24,
25;34:1,2,3,14,17,19,
21,25;35:3,9,19;36:4,8,
12,16,18;37:10,16,18,
19,21,24,25;43:1,2,4,5,
6;45:8,15,18,23;46:7,9,
18,24;47:8,23;48:8,9,
15,17,20,20,24;49:3,6,
9,12,18,22,24;50:3,3,7,
9,14,18,18;51:10,12,
14,16,20,20,24;52:2,5,
7,9,13,15,17
**Court's (5)**
6:17;7:12;13:15;

36:15;51:3
**create (1)**
7:22
**credit (5)**
20:12,17;21:10;
22:21;23:1
**credulity (1)**
43:25
**criminal (3)**
44:10,16;46:11
**cross (1)**
28:21
**crumbled (1)**
38:12
**currency (6)**
8:17;10:15,22;11:16,
19,23
**current (1)**
32:12
**curse (1)**
38:24
**custody (3)**
31:24;47:2,19
**cutting (1)**
26:20

## D

**dangerous (5)**
28:14,22;43:8,9;
47:11
**dangers (1)**
46:4
**date (3)**
16:18;50:15,20
**day (11)**
17:9;19:22;26:8;
37:7;38:14,15,20,25;
44:24,24;49:16
**days (4)**
35:15;47:19;50:15,
20
**DEA (2)**
8:15;9:9
**deadline (1)**
50:24
**deal (1)**
37:7
**dealer (2)**
23:7;29:6
**dealers (1)**
29:10
**dealing (4)**
19:25;26:13;28:20;
29:19
**dealings (1)**
37:2
**death (7)**
38:14,15;39:14,14,
15;40:13;44:2
**decade (1)**
38:9
**decide (1)**

8:7
**decided (1)**
21:23
**decision (1)**
34:14
**decisions (3)**
40:5;41:1;42:5
**deem (1)**
47:16
**default (1)**
9:20
**DEFENDANT (38)**
4:9,12,14,17,20,22;
6:8;7:11;8:10;9:5;10:8,
10;14:12,15,17,21,25;
15:3,5,9,15;16:24;
17:1;34:13;37:23;43:9,
12,21;44:16;45:24;
46:24;49:5,8,11,14,20,
24;50:3
**defendants (2)**
6:18;27:20
**defendant's (3)**
10:4;45:8;46:21
**defense (5)**
6:5,12,19;45:11;46:6
**defensive (1)**
29:11
**delivered (3)**
19:4,7,8
**demean (1)**
45:2
**departure (4)**
30:6,16,21;32:5
**dependent (1)**
26:6
**depending (1)**
21:20
**derived (3)**
14:2,3,4
**describe (3)**
28:5;40:11,11
**described (2)**
26:9;51:17
**describes (1)**
27:1
**designated (1)**
31:23
**designation (1)**
50:2
**despite (2)**
31:6;40:2
**detect (1)**
10:7
**deter (1)**
44:15
**determining (2)**
43:4;45:20
**deterred (1)**
45:5
**deterrent (2)**
30:9;32:10
**detour (1)**

38:4
**detrimental (1)**
33:9
**Devens (2)**
31:23;50:1
**diagnosed (1)**
38:10
**die (4)**
38:12,19,21;39:17
**different (1)**
40:7
**digress (1)**
26:1
**digressed (1)**
27:10
**directed (1)**
47:22
**disappointed (2)**
42:16,17
**discharged (1)**
51:6
**disclose (2)**
16:6;48:12
**disclosed (1)**
46:25
**discrepancy (1)**
11:11
**discuss (2)**
11:6;13:22
**discussed (2)**
19:1;51:22
**discussing (1)**
14:1
**discussion (1)**
18:6
**discussions (1)**
9:6
**disease (6)**
28:10;38:11;39:23;
40:12;42:19,21
**dismiss (5)**
52:3,4,5,7,9
**dismissed (1)**
52:13
**distribute (1)**
4:5
**distributed (1)**
12:24
**distributing (1)**
28:17
**distribution (5)**
4:5;27:12,18;29:3;
43:8
**District (4)**
3:2;18:17,20;52:17
**Division (1)**
9:15
**DNA (1)**
47:10
**DOC (1)**
25:22
**doctor (1)**
35:16

**document (1)**
12:19
**documentation (1)**
50:6
**dollars (31)**
8:17;10:17,22;11:7,
12,19,23;13:18;16:14,
15,17,22;17:14,25;
18:4;19:3,23;20:4,10,
11,22;21:14;22:6,13,
25;39:19;44:23;46:14,
15;49:8,17
**done (5)**
16:9;33:2,3,3;37:12
**down (4)**
11:15;40:14,18;
42:15
**downward (1)**
30:16,21;32:5
**drive (1)**
42:5
**driver (1)**
44:20
**drives (1)**
44:17
**driving (1)**
45:3
**dropped (1)**
11:3
**drove (1)**
38:8
**Drug (8)**
3:11;10:16;29:6,10;
43:21;46:1,24;47:18
**drug- (1)**
12:3
**drugs (3)**
43:8,15,18
**due (1)**
16:4
**during (7)**
4:13;6:12;9:5;10:2,
4;27:17;47:5

## E

**earlier (1)**
38:17
**Early (1)**
10:20
**education (2)**
38:23;48:6
**educational (1)**
45:8
**effect (4)**
7:18;32:10;33:9;
43:12
**either (5)**
8:6;20:1;21:21;23:6;
37:8
**else (3)**
8:9;13:24;44:12
**employed (4)**

24:14,14,15;48:3
**employee (1)**
25:22
**employment (3)**
47:14,25;48:3
**end (4)**
33:5,14;34:11;43:23
**ended (5)**
11:10;15:15;21:21;
23:6;38:4
**ends (2)**
38:4;39:12
**enemy (1)**
40:19
**Enforcement (1)**
3:11
**engaged (5)**
27:18;43:25;46:22;
48:5,6
**engaging (3)**
44:9,16;46:1
**enhancement (1)**
30:4
**enjoy (2)**
39:9;42:22
**enjoyment (1)**
44:11
**enjoys (1)**
44:7
**entered (7)**
4:2,6;6:23;7:11;
9:19;33:4;51:9
**enterprise (1)**
11:17
**entire (1)**
36:24
**entirety (1)**
46:18
**entitled (1)**
51:1
**environment (1)**
25:21
**equipped (1)**
45:10
**equity (1)**
21:12
**especially (3)**
32:9;38:1;40:11
**establish (1)**
7:3
**estimate (2)**
14:14;15:6
**estimated (5)**
14:16;15:7,8,23,24
**evaluations (1)**
47:21
**even (9)**
15:13;23:25;26:24;
29:14;31:6;39:3;43:8;
45:13;48:10
**evening (1)**
26:25
**everybody (1)**

38:6
**evident (1)**
32:20
**exacerbate (1)**
31:16
**exactly (2)**
20:5;33:11
**example (1)**
11:6;12:19;40:2,3;
45:6
**except (1)**
6:21
**excess (1)**
33:9
**excessive (1)**
33:11
**exchange (1)**
13:2
**excluded (1)**
6:23
**Excuse (5)**
17:11;22:9;37:13;
38:7;46:14
**execution (1)**
38:16
**expecting (1)**
38:15
**expense (1)**
50:22
**expensive (3)**
12:13;19:18;23:10
**experiences (1)**
44:24
**explain (1)**
31:11
**extension (10)**
14:7,10,13,18,19;
15:10,17,20,20,25
**extensively (1)**
23:9
**extent (1)**
26:7
**extinguished (1)**
23:3
**extraordinary (1)**
30:20
**eyes (1)**
45:2

**F**

**face-to-face (1)**
38:5
**facilities (2)**
10:10;31:24
**facility (3)**
9:4;49:25;50:4
**fact (10)**
4:24;19:4,5,8;29:14,
17;30:5;33:10;39:1;
51:1
**factor (2)**
12:6,7

**factors (2)**
43:5;46:17
**facts (4)**
4:25;5:21,23,24
**factual (1)**
5:19
**failed (2)**
8:3;32:11
**failure (1)**
48:12
**fairly (3)**
10:1;12:1;28:10
**faith (1)**
42:7
**family (19)**
25:20;34:9;35:11;
37:4,6,9,25;38:5,21;
39:5,10,16,19,22;40:9,
16;44:1,24;46:4
**fantastic (1)**
35:13
**far (4)**
14:1;16:12;36:23,25
**fatal (2)**
28:11;32:4
**father (10)**
25:21,21;35:13,20,
21;36:23;39:8;40:22;
42:10;44:22
**fathers (1)**
43:17
**FCI (1)**
50:1
**fear (2)**
38:5;39:4
**federal (2)**
3:16;47:9
**feel (4)**
39:3,15;40:8,13
**fees (1)**
48:25
**Feliciano (1)**
24:4
**felon-in-possession (1)**
7:13
**fentanyl (2)**
28:16,18
**Fernandez (3)**
7:17;30:7;46:8
**field (1)**
15:24
**fifteen (2)**
26:2;47:19
**fifteen-plus (1)**
13:21
**fight (1)**
40:1
**fighting (1)**
38:19
**figure (1)**
11:24
**figuring (1)**
15:11

**file (10)**
14:5,7,10;15:10;
50:17,19,20,25,25;
51:18
**filed (9)**
14:6,20;15:16,21,24,
25,25;21:10;50:7
**files (1)**
12:10
**filing (2)**
14:8;48:25
**finance (2)**
21:4;23:6
**financed (2)**
21:4;23:10
**financial (13)**
16:6,9;18:22,24;
22:4,16;24:1;43:17,22,
23;44:15;46:25;48:12
**financing (1)**
21:24
**find (2)**
10:1;11:9
**findings (1)**
5:24
**fine (3)**
46:14;48:10,11
**firearm (14)**
4:4;6:22;7:14,15,23;
28:23,24,25;29:2,4;
45:25;46:2;47:11;
51:21
**fired (1)**
29:14
**first (12)**
6:3,14;7:1;8:7;
13:22;18:7;22:15;30:3,
16;31:12;37:23;47:18
**five-year (2)**
46:13;47:4
**Florida (2)**
25:22,23
**followed (1)**
47:4
**following (6)**
21:7;31:25;45:5,6;
46:19;47:13
**food (1)**
49:15
**football (3)**
40:23;41:8;43:16
**footsteps (1)**
45:6
**Force (1)**
3:10
**forfeit (1)**
8:11
**forfeited (8)**
8:15,23,24;9:11;
17:22;18:2;19:21;
21:19
**forfeiture (10)**
7:23;9:15,22;21:11;

22:7;23:1,3,5;51:16,21
**forget (1)**
41:20
**forgot (1)**
14:23
**formally (1)**
23:17
**former (1)**
25:21
**fortunately (1)**
28:16
**forty (2)**
48:5,7
**forty-three (1)**
7:25
**forty-two (1)**
25:19
**forward (1)**
34:21
**forwarded (1)**
5:25
**Four (1)**
38:9
**fourteen (1)**
50:15,20
**Frank (1)**
3:9
**free (1)**
13:13
**friend (1)**
35:13
**friends (1)**
49:20
**front (3)**
21:8;48:19;51:19
**fulfill (2)**
45:21;46:20
**full (2)**
25:24;31:24
**full-time (2)**
47:24;48:2
**fully (5)**
16:6;39:5;46:25;
48:3,12
**funds (1)**
38:23
**further (3)**
43:2,3;52:1

**G**

**gain (3)**
43:22;44:11,15
**games (2)**
40:23;43:16
**gas (2)**
39:18;44:23
**gentleman (1)**
27:6
**gets (2)**
30:12;50:10
**girl (2)**
49:21,22

**giving (2)**
35:6;37:24
**goal (1)**
32:19
**goes (2)**
8:25;50:6
**Gomez (2)**
26:22;27:1
**Good (11)**
3:5,8,12,13;35:12;
39:8;41:5,7,8,12;43:16
**Gordon (3)**
3:8
**Government (16)**
5:20;6:4,14,19;7:3;
9:18;10:3;16:4;17:3;
21:20,21;29:25;34:6;
37:25;46:5;52:9
**Government's (3)**
20:15;38:18;51:20
**graduation (1)**
40:24
**grandiose (1)**
44:7
**grant (1)**
8:8
**grants (1)**
51:20
**great (4)**
35:9;41:8,24;44:24
**greater (3)**
30:10;45:21;46:19
**great-hearted (1)**
35:23
**greedy (3)**
27:13,14,14
**growing (1)**
42:22
**grownup (1)**
42:23
**guess (2)**
8:20;12:5
**guide (1)**
40:25
**guideline (9)**
6:20;7:1;30:1,17;
34:10,11;45:19;46:9,
12
**guidelines (2)**
45:17,17
**guilty (5)**
4:2,6;7:11;38:17;
51:10
**gun (5)**
7:8;8:12,24;29:9,20
**guns (1)**
29:10
**guy (1)**
17:17
**guys (2)**
40:18,20

# H

**hairs (1)**
26:20
**HALL (39)**
3:8,8;5:22;6:15,17;
8:12;9:2,11,17,25;10:7,
14;12:5,16,18;13:1,4,6,
8;17:11,24;18:13;19:3,
13,16,21;21:18;22:2;
23:4,9,13;35:1;51:8,13,
15,23;52:6,8,14
**handed (1)**
40:14
**handle (1)**
45:10;50:4
**happen (1)**
39:5
**happened (3)**
27:9,16;31:21
**happy (3)**
13:10;18:10;36:1
**hard (3)**
22:11;31:17;35:15
**hardworking (2)**
42:4;44:22
**Hartford (2)**
8:2;32:15
**head (1)**
11:15
**health (1)**
47:21
**hear (9)**
6:3,5,14;26:15;27:2;
28:11;44:5,5,6
**heard (5)**
17:4,16;34:15;43:13;
45:11
**heart (2)**
42:10,13
**hearted (1)**
27:3
**hearts (1)**
41:10
**held (4)**
7:7;8:13;9:4;46:3
**help (4)**
35:17;41:12,17,18
**helped (3)**
26:23;36:25;37:1
**helpful (6)**
27:2,2;35:22;36:10;
37:4,7
**helping (1)**
25:5
**hereby (1)**
47:2
**herself (1)**
24:17
**Hi (1)**
36:20
**highlights (1)**

25:15

**himself (9)**
12:21;25:16;26:1,15;
29:4;33:25;34:16;
43:10;46:3
**history (2)**
43:20;46:11
**hit (1)**
25:15
**Hm (1)**
19:20
**hold (2)**
34:14;41:20
**holidays (1)**
35:14
**home (7)**
35:12;37:5;39:22,22,
25;40:12;47:14
**honestly (5)**
36:21;37:2,6;40:13;
46:25
**Honor (51)**
3:8,13,20,22;4:12,17,
20;5:13,22;6:8,15;
9:12,25;13:10;14:12;
16:16;17:9,13;18:9,19;
20:19,21;21:8;23:17;
25:10,12;27:11,19;
30:11;35:7;36:6,17;
37:18,23;38:6;39:1,11;
40:6,10;42:18;43:1,3;
48:16,18;49:5;50:2,8;
51:8;52:1,4,8
**Honorable (5)**
3:2;18:16,19;42:9;
52:16
**hope (3)**
31:24;34:2;39:24
**hoped (1)**
13:1
**hoping (1)**
31:22
**horrible (1)**
37:11
**Hospital (2)**
31:14,20
**hour (2)**
39:19;44:23
**hours (4)**
48:4,4,5,7
**house (7)**
11:10,22;18:1;19:24;
27:21;29:22;41:18
**housed (2)**
49:24;50:4
**household (6)**
5:7,9;23:22;24:7,8;
25:2
**humble (1)**
42:9
**hundred (2)**
11:7;49:8
**hundred-dollar (1)**

49:23
**hurts (1)**
40:10
**husband (2)**
35:12;36:1

# I

**idea (1)**
23:14
**identify (1)**
38:3
**ignorance (1)**
37:3
**II (2)**
46:11;52:11
**illegal (1)**
46:1
**illegally (1)**
47:12
**illicit (1)**
43:18
**illness (2)**
28:5;37:7
**image (1)**
44:25
**imagination (1)**
34:8
**important (1)**
36:25
**importantly (1)**
41:24
**impose (4)**
33:14;43:5;48:9,11
**imposed (5)**
32:21;34:13;44:13;
50:14;51:7
**imposes (1)**
6:6
**imposing (1)**
32:9
**imposition (2)**
6:13;32:1
**impoverished (1)**
44:17
**imprisonment (1)**
45:14
**incarcerated (2)**
25:18;33:12
**incarceration (4)**
14:9;26:5;31:5;
44:25
**inception (1)**
13:22
**include (4)**
7:14;24:18;46:7;
48:1
**including (1)**
38:6
**inclusion (1)**
6:21
**income (1)**
12:9

**incorrect (1)**
4:25
**increase (3)**
6:22;7:14;46:7
**incumbent (1)**
7:2
**incurable (1)**
38:11
**Indeed (1)**
51:3
**independent (2)**
24:17;42:3
**indicate (4)**
15:19,23;20:8;36:5
**indicated (6)**
6:24;8:5;10:20;
25:19;30:15;36:6
**indication (1)**
7:8
**indictment (3)**
4:2;52:10,12
**indiscernible (1)**
42:24
**individual (6)**
17:7;18:5,6;27:8;
44:7,8
**individuals (2)**
6:10;33:12
**infects (1)**
45:4
**infinity (2)**
41:20,20
**inherent (1)**
46:4
**injures (1)**
44:10
**inmate (2)**
36:7,10
**inpatient (1)**
47:23
**instance (1)**
32:25
**intend (2)**
6:7;8:4
**intended (1)**
12:9
**intent (1)**
4:5
**intercept (2)**
10:3;17:15
**intercepted (1)**
10:12
**intercepts (2)**
10:20;11:14
**interest (2)**
21:12;23:11
**intervention (1)**
31:7
**interview (3)**
4:8,13;10:4
**interviewed (1)**
4:15
**into (16)**

6:23;13:21;27:10;
28:22;30:6,8;31:20;
33:4;34:3,4;35:10,10;
38:10;42:2;45:19;
46:17
**involved (5)**
26:14;27:12;28:16;
29:16;43:8
**involvement (1)**
27:19
**IRS (1)**
14:20
**Island (1)**
31:14
**issue (3)**
18:8;9;29:23
**issued (1)**
9:21
**issues (2)**
5:19;29:23
**items (1)**
8:12
**IV (1)**
52:11

**J**

**J12 (1)**
32:17
**jail (1)**
38:2
**joint (1)**
23:22
**Joshua (1)**
3:10
**JQ (5)**
36:19,20,20;40:17;
41:3
**Judge (1)**
48:19
**judgment (2)**
50:15,21
**July (1)**
8:2
**justifying (1)**
39:12

**K**

**keep (5)**
21:22;41:4,7,7;42:1
**key (2)**
9:7,7
**kids (7)**
35:13,16,18,21;40:1;
42:7,11
**kids' (1)**
41:23
**kilos (1)**
19:24
**kind (7)**
12:12;19:19;27:3,3;
28:20;30:8;37:3

**kindhearted (1)**
27:8
**kinds (1)**
45:15
**Knowing (1)**
38:12
**known (5)**
26:3,20;27:5;36:23;
39:17
**knows (4)**
19:10;27:11;28:13;
32:6

**L**

**laced (1)**
28:18
**largesse (1)**
24:1
**last (3)**
14:23;19:10;26:25
**late (2)**
19:18;26:25
**late-model (1)**
8:20
**launder (1)**
12:20
**laundered (2)**
10:24;12:3
**lavish (2)**
44:21;45:6
**lavishly (1)**
9:23
**law (4)**
13:25;32:22;38:10;
51:5
**laws (1)**
43:14
**lawyers (1)**
38:17
**leads (1)**
27:15
**lease (1)**
21:17
**least (3)**
15:17;47:20;48:1
**leave (1)**
38:21
**led (1)**
28:19
**left (2)**
39:10;41:21
**legacy (1)**
38:21
**legal (4)**
47:24;48:2,3;51:4
**legally (2)**
23:18,19
**legitimate (1)**
10:11
**legitimately (1)**
26:14
**Leicester (1)**

32:17
**lethal (2)**
30:22;43:18
**letter (5)**
26:22,24,25,25;
36:21
**letters (1)**
6:10
**letting (1)**
40:18
**Levante (1)**
22:19
**level (2)**
45:24;46:11
**liabilities (6)**
21:16;22:4,14;23:2;
43:24;44:3
**liability (4)**
15:7,8;20:14,18
**lien (1)**
21:22
**life (11)**
29:18;30:12,14;
35:11;36:24;38:2,13,
23;39:16;40:9;41:8
**life- (1)**
32:3
**life's (1)**
40:1
**lifestyle (2)**
44:21;45:6
**life-threatening (1)**
30:19
**light (2)**
48:11;50:11
**line (4)**
21:16;22:8,10,13;
23:15
**listed (3)**
20:13,18,19
**listen (1)**
41:16
**listened (1)**
7:6
**listening (1)**
10:18
**little (7)**
10:16,19;21:13;24:3;
41:13,15;49:11
**live (6)**
5:9;25:22,23;38:20;
40:3;44:21
**lives (3)**
5:7;42:1,6
**living (1)**
38:14
**loan (2)**
20:17;22:15
**local (1)**
47:9
**located (2)**
11:1;29:13
**locked (1)**

29:22
**long (6)**
13:20;24:15;27:5;
30:11;32:9;48:19
**longer (1)**
50:16
**look (4)**
18:22;41:3,4;44:19
**loosely (1)**
12:6
**lose (2)**
39:21;42:21
**lost (2)**
39:20,20
**lot (3)**
8:20;10:12;14:3
**lovable (2)**
35:19;42:9
**love (5)**
37:13;39:9;40:3;
41:5,19;42:12
**loving (1)**
37:6
**low (1)**
33:5
**lower (4)**
33:14;34:11;38:18,
18
**lucky (1)**
28:19
**lucrative (1)**
12:1

**M**

**ma'am (1)**
34:21
**Magnum (4)**
7:24;43:10;45:25;
51:21
**Mag-Tac (1)**
7:25
**maintain (1)**
47:24
**major (2)**
32:8,8
**makes (1)**
39:2
**making (1)**
40:25
**male (1)**
10:23
**man (3)**
26:1,18;34:7
**mandatory (5)**
30:2;38:18;45:18;
46:13;47:6
**manner (1)**
50:25
**many (6)**
11:22;27:11;29:10,
10;45:4,4
**Mareserati (1)**

44:9
**marijuana (1)**
26:6
**married (3)**
23:17,18,19
**Marshal (1)**
50:7
**Maserati (17)**
8:16,19;9:4,4,20,24;
19:14;20:9,10;21:12,
13,19;22:19;44:18,20;
45:1,3
**matter (8)**
3:3;13:9;27:20;
29:13;33:10;34:14;
35:22;52:18
**matters (2)**
5:18;26:3
**May (13)**
3:6;5:1,6:12;9:13;
26:8;38:7;41:9,10;
44:21;47:8,10,11;
50:17
**maybe (2)**
10:10;20:4;49:22
**mean (4)**
10:14;15:18;33:1;
42:11
**means (1)**
39:12
**Medical (9)**
31:10,18,23;33:16,
16;45:9,11;49:25;50:4
**medicines (1)**
35:18
**member (1)**
3:15
**memo (1)**
36:16
**memorandum (7)**
6:25;25:13,14;30:15;
32:6;34:4;36:7
**memories (3)**
38:22;39:8;41:21
**men (2)**
42:2,7
**mental (1)**
47:21
**mention (1)**
7:21
**mentioned (3)**
5:3;19:13;51:15
**Mercedes (2)**
22:8,10
**Merritt (2)**
17:1,2
**mess (1)**
37:12
**messed (3)**
27:9;34:8;9
**mic (1)**
35:4
**Michael (1)**

14:22
**microphone (1)**
37:21
**might (2)**
9:24;37:12
**million (2)**
46:14,15
**mine (1)**
9:6
**minimum (3)**
30:1;38:19;46:13
**Mishoe (1)**
32:6
**misremembered (1)**
19:17
**miss (4)**
35:12,14;37:6;41:1
**missed (3)**
11:12,25;35:24
**missing (1)**
40:24
**misstatements (1)**
4:24
**model (4)**
19:18;36:7,9;41:5
**mom (4)**
41:12,17;49:20,20
**moment (3)**
18:10;38:13;40:10
**moments (1)**
41:2
**money (32)**
8:20;10:15,24;11:1,
3,3,4,7,9,9,17;12:8,11,
19,19,21;13:2,12;14:2,
3,6,8;16:22;17:6;
19:11,11;28:7;46:22;
48:17,20,22;49:18
**money-laundering (1)**
11:16
**monster (1)**
34:7
**month (1)**
46:13
**monthly (2)**
47:25;48:1
**months (14)**
16:16,18;25:19;26:5;
27:24;30:2,11;31:6,15;
33:5,6;34:12;46:12;
47:3
**more (17)**
26:21;27:13,14,14;
28:19;31:21;33:6,9,13;
34:12;38:9;39:3,3,3,
13;45:13;49:11
**most (6)**
36:25;38:5;39:4;
40:24;41:24;42:9
**mother (2)**
5:8;25:21
**mothers (3)**
24:4;41:23,24

**motion (6)**
7:23;8:5,6,8;51:18,
21
**mouth (1)**
31:18
**move (4)**
27:6,7;51:16;52:9
**much (18)**
3:20;7:9;11:3,4;
13:9;26:11;28:19;
33:13;34:18;36:17;
40:7;42:11,12,16,25;
43:13;49:6,12
**multiple (1)**
43:21
**music (2)**
14:4;26:14
**music- (2)**
13:18,19
**must (8)**
43:5,6;44:13;45:8,
15,18;50:20,24
**myself (3)**
35:12;39:3;42:17

## N

**name (5)**
5:6,6,12;14:22,23
**named (1)**
24:4
**narcotics (7)**
27:12,14,18;28:15,
17,18;29:4
**narrow (1)**
26:12
**nature (3)**
12:7;43:6,11
**nearest (1)**
50:11
**necessarily (3)**
12:14,15;13:9
**necessary (6)**
30:10;32:3;34:13;
45:21;46:20;49:3
**need (8)**
5:18;7:21;32:21;
33:21;40:21;41:14,16;
45:5
**needed (6)**
8:24;27:7,7;29:7,9;
43:10
**needs (4)**
41:18;45:9,9;50:11
**negotiated (1)**
46:5
**New (10)**
10:23;11:15;17:7,9,
15;18:5;19:4,8;23:9;
32:18
**nice (2)**
27:3,8
**nineteen (3)**

25:18;27:24;31:6
**non- (1)**
9:3
**nor (2)**
19:12;29:21
**normal (1)**
21:20
**note (4)**
7:1;32:2;46:21;47:8
**notwithstanding (1)**
30:5
**NQ (2)**
40:17;41:16
**number (6)**
3:4;7:24;8:12;14:4,
5;36:14
**numbers (1)**
15:11
**numerical (1)**
11:5
**numerous (2)**
26:24;27:19
**nurturing (1)**
25:20

## O

**objection (2)**
51:7,8
**objections (1)**
5:20
**observed (1)**
20:1
**obtain (1)**
47:24
**Obviously (3)**
32:8,8;43:7
**occasions (1)**
26:24
**occupation (1)**
48:4
**occupy (1)**
10:12
**O'CLOCK (2)**
3:1;52:19
**off (6)**
8:13,14;11:3;23:4;
27:4;34:14
**offense (10)**
7:4;32:13,22,23;
43:7,7,11;45:24;46:10;
47:9
**offenses (3)**
25:25;32:10,13
**offensive (2)**
29:11,21
**offered (1)**
27:6
**office (11)**
3:25;4:8,16;6:21;
9:14,16;13:22;26:25;
27:7;47:16,22
**Officer (2)**

3:10;5:11
**officer's (1)**
45:23
**offshore (1)**
12:21
**old (2)**
5:6;25:19
**older (1)**
30:14
**oldest (2)**
36:20;41:3
**omission (1)**
5:2
**omit (1)**
36:5
**once (3)**
11:15;31:7,24
**one (33)**
4:2,4;5:1,2,2;9:2,2;
11:18;13:2;14:4,24;
15:1;19:13,16;20:2;
22:15,19,25;23:10;
24:4,6,20;26:4,8;
27:22;29:23;32:14,17;
36:5;38:14;40:5;41:21;
44:17
**one-hundred-dollar (1)**
48:8
**only (12)**
24:24;26:12;28:14;
31:7;32:3,14;35:11;
36:9;37:24;40:7,21;
44:15
**onto (1)**
41:20
**open (2)**
3:3;18:20
**opportunity (2)**
35:6;37:24
**opposed (1)**
12:3
**opposite (1)**
33:11
**oral (2)**
8:4;51:21
**order (10)**
5:25;7:23;8:6;11:15;
12:20;14:13;43:10;
47:23;48:22;51:16
**orders (5)**
9:19,20,21;48:8,20
**original (1)**
52:10
**Orlando (5)**
35:10,12,14,16;36:1
**others (8)**
25:17;27:19;30:9;
34:15;43:22;44:14,16;
45:5
**other's (1)**
42:1
**out (12)**
8:3;15:11;19:22;

21:16,25;29:13;30:13,
14;32:18;40:24;48:14,
23
**outlook (1)**
38:13
**outpatient (1)**
47:22
**outstanding (3)**
22:7,22,24
**over (12)**
7:6;10:8,16,20;
11:11,19;17:4;21:13;
40:6;41:9,11,13
**overall (1)**
35:23
**overestimate (2)**
29:15,17
**owed (1)**
20:2
**own (4)**
43:22;44:10,15;
45:25
**owner (1)**
10:6

## P

**page (2)**
30:15;32:7
**paid (4)**
20:1,5;21:24;23:4
**paper (1)**
51:18
**paperwork (3)**
16:2,3;50:19
**paragraph (1)**
5:3
**parent (1)**
42:21
**parents (1)**
42:14
**Parkway (1)**
17:1,2
**part (2)**
16:15,22
**participate (1)**
47:21
**particular (3)**
14:3;20:9;34:13
**Particularly (1)**
28:14
**parties (2)**
3:6;6:24
**parties' (2)**
46:8,10
**pass (1)**
28:9
**passed (1)**
28:9
**past (1)**
19:17
**Paul (1)**
30:3

**pay (9)**
12:23;14:16;15:7,7;
21:22;48:2,8,25;49:22
**paying (1)**
20:6
**payment (1)**
48:24
**pela (1)**
34:5
**pemphigus (2)**
30:18;38:11
**people (13)**
26:18,19;27:11;
28:20;29:19;33:24;
36:10;42:10;43:14;
44:10,19,19;45:13
**per (4)**
47:20;48:4,5,7
**perfect (1)**
39:11
**perhaps (1)**
10:24
**period (5)**
7:6;46:13;47:3,4,5
**pernicious (1)**
44:14
**perseverance (1)**
40:2
**person (19)**
4:3;15:21;17:15,16;
27:1,3,3;35:9,17,19,21,
22,24;36:25;39:12;
44:9,14,20;47:14
**personal (1)**
44:11
**person's (1)**
30:12
**pertains (1)**
52:10
**petty (1)**
44:15
**ph (11)**
3:10,17;5:7,8:5;
9:16;14:22;22:16;24:4;
32:17;40:17,17
**phone (4)**
7:5;10:11;41:9;
49:16
**phones (2)**
7:6;28:1
**physical (3)**
30:18;44:6;50:5
**pick (2)**
9:17;39:23
**picked (1)**
9:18
**pieces (1)**
39:23
**place (2)**
29:13;47:14
**places (1)**
27:21
**planned (1)**

14:5
**plea (10)**
4:2,7;6:19;7:11,18;
29:24;33:4;34:11;
46:10;51:9
**plead (1)**
38:17
**pleads (1)**
7:15
**Please (7)**
25:7;34:22;41:3,25;
42:11;47:1;48:14
**PM (2)**
3:1;52:19
**podium (4)**
34:21,22;35:3;37:20
**point (6)**
11:11;25:16;33:23;
38:3,8,12
**pointed (1)**
19:21
**poison (1)**
43:21
**police (1)**
47:17
**portion (2)**
6:12;12:10
**posited (1)**
45:24
**position (4)**
16:6;42:2;46:25;
48:12
**possess (4)**
4:5;43:10;47:11,12
**possessed (1)**
46:23
**possession (4)**
4:3;6:22;19:12;
27:12
**possibly (2)**
25:13;28:21
**potentially (2)**
30:19,22
**practice (1)**
13:24
**premises (1)**
8:1
**preparation (1)**
3:17
**prepare (1)**
25:12
**prepared (2)**
26:16;36:22
**preparer (1)**
16:1
**preparing (3)**
10:21;15:21;16:2
**present (3)**
4:11,18;42:5
**presented (2)**
45:7,12
**pre-sentence (9)**
4:8,21,24,25;5:11,19,

21,24,25
**pretty (2)**
14:21;26:11
**primarily (3)**
14:2,3,4
**primary (1)**
24:9
**prior (8)**
6:13;10:17;13:20;
16:18;31:5;32:10,11,
13
**Prison (6)**
6:1;30:25;31:2;
32:15;33:20;38:19
**Prisons (5)**
31:25;32:1;33:20;
45:10;47:3
**probably (4)**
23:4;27:24;39:13;
49:16
**probation (12)**
3:24;4:7,15;5:11;
6:22;7:19;10:5;33:2;
45:23;47:16,23;48:1
**Probation's (1)**
6:21
**problems (1)**
42:23
**procedurally (1)**
51:4
**proceed (1)**
25:7
**proceeding (1)**
51:17
**proceedings (3)**
6:1,13;51:22
**proceeds (4)**
10:16;12:14,15;
21:25
**process (3)**
4:13;8:15;14:17
**profits (2)**
12:14,15
**prohibited (1)**
4:3
**promote (1)**
32:22
**promoter (1)**
10:5
**promotion (3)**
13:19,20;26:14
**proof (1)**
6:4
**proper (1)**
51:4
**properly (1)**
15:17
**protect (5)**
29:4;43:10,14;44:13;
46:2
**protecting (1)**
46:3
**protection (2)**

29:7,9
**protective (1)**
47:17
**proud (2)**
37:11,13
**provide (5)**
32:22;39:16;44:1;
50:6,19
**provided (1)**
33:15
**Providence (1)**
31:14
**PSR (3)**
25:20;26:9;36:12
**public (4)**
43:14;44:13;45:7;
50:22
**Puerto (1)**
10:5,25;11:18
**pull (1)**
22:12
**punished (2)**
39:7,15
**punishment (2)**
30:8;32:23
**punishments (1)**
32:11
**punitive (1)**
32:24
**purpose (2)**
32:24;46:3
**purposes (6)**
29:11,11,21;33:7;
45:22;46:20
**put (3)**
35:10;40:8;42:2

**Q**

**Quiros (52)**
3:3,14;4:1;6:3;7:7,9;
8:22;9:13;11:3,14;
12:1,9,11,20;13:18,21;
15:19;16:5,17;17:4,14,
17;18:4;19:10;20:1,11;
23:13,14;24:18;25:16,
18,24;26:2,5,15,23;
27:9;29:25;30:12;
32:24;33:8,24,25;34:6,
15;35:10;37:17;43:25;
50:10,13;51:9;52:10
**Quiros' (6)**
9:8;10:20;30:18;
44:6;45:5,11
**quit (1)**
26:11
**quite (1)**
28:5
**quote (1)**
32:8

**R**

**raise (2)**
42:7,8
**raised (1)**
25:20
**raising (1)**
42:2
**random (1)**
47:18
**range (3)**
33:13;34:10,12
**rare (1)**
38:11
**rate (1)**
20:4
**rather (1)**
39:18
**read (5)**
4:21;21:15;36:8,12;
44:4
**reading (1)**
22:11
**realize (1)**
27:17
**really (7)**
18:8;25:16;29:17;
37:8;39:21;40:21;
41:14
**reason (6)**
29:7;32:8;33:8;
38:16;43:14;45:25
**reasonable (2)**
47:15;48:11
**reasons (3)**
6:24;32:11;39:2
**recall (2)**
9:3;49:14
**recalls (1)**
16:1
**receipts (1)**
15:12
**receive (1)**
13:1
**received (2)**
12:24;27:25
**recess (7)**
3:3;18:11,12,17,18,
20;52:17
**recidivism (1)**
33:13
**recognize (1)**
32:20
**recollection (1)**
32:16
**recommendation (1)**
50:2
**recommended (3)**
45:16,19;46:12
**recommends (2)**
49:24;50:3
**record (2)**
3:7;46:18
**records (3)**
33:16,17,19

redacted (1)
33:15
reflect (1)
32:21
refuses (1)
50:17
regard (1)
44:12
regarding (2)
5:19;9:20
regardless (1)
37:11
regular (2)
31:4,5
regurgitate (1)
25:14
reinvested (1)
12:3
related (1)
7:8
relationship (1)
32:12
relatively (1)
44:17
release (4)
46:14;47:5,5,19
relevant (2)
13:16,17
reluctantly (1)
48:9
remember (3)
38:22,22;49:14
remind (1)
42:12
remit (1)
12:11
remorseful (1)
25:25
report (9)
4:21,24,25;5:11,19,
21,24,25;47:25
reports (1)
33:21
represent (2)
12:13;50:22
represented (1)
26:3
representing (4)
3:24;13:20;26:2;
50:17
represents (1)
12:13
request (4)
14:6,10,13,19
required (3)
32:20;47:25;51:5
requirement (1)
16:6
requires (1)
32:11
residence (3)
9:8,23;24:9
residences (1)

9:3
resolving (1)
11:10
resources (1)
43:17
respect (12)
3:17;13:11,18;14:5,
7;21:11;26:9,17;27:13;
28:11;29:24;32:22
respectful (1)
42:8
respond (1)
18:9
responsibility (2)
25:24;51:6
responsible (1)
35:20
rest (1)
40:16
resulting (1)
46:10
return (3)
14:5;15:4,22
returns (2)
14:7,8
review (2)
22:3,3
reviolations (1)
33:12
revolver (1)
7:24
Rhode (1)
31:14
Rican (1)
10:5
Rice (1)
11:18
Rico (1)
10:25
right (25)
3:14,15;4:1;5:10;
6:5;12:18;13:6;17:18;
18:25;24:23;29:1;
30:13;34:24;35:1,2;
39:2,25,25;40:1,18,18;
41:1;45:1;49:15;51:2
righty (2)
18:21;25:7
rise (2)
18:16;52:16
role (1)
41:5
rough (1)
37:8
roughly (1)
19:23
rounds (1)
7:25
row (1)
38:15
run (2)
11:8;51:11

## S

sacrifice (1)
44:14
sad (1)
35:14
safety (1)
29:20
sale (1)
29:3
same (2)
6:20;51:11
sample (1)
47:10
sat (1)
38:2
saw (1)
26:22
saying (3)
11:5;31:19;35:23
Schaeffer (1)
8:5
school (1)
41:7
screening (1)
47:18
search (2)
27:25;47:15
second (4)
22:19;32:5,7;39:24
section (2)
7:2,2
secure (1)
12:21
seemed (1)
7:9
seize (2)
9:7;11:22
seized (8)
8:1,10;9:9;10:15,15;
11:20;16:17;19:23
seizure (1)
20:16
send (2)
13:23;44:18
sense (1)
12:23
sent (1)
10:25
sentence (25)
6:6;32:1,9,12,14,19;
33:1,8;39:13,14,15;
40:14;43:4;44:13;
45:19,20;46:6,12,19;
47:4;50:14;51:3,7,11,
19
sentenced (2)
7:12;45:14
sentencefor (1)
32:13
sentences (3)
33:10,13;45:15

sentencing (21)
3:17;6:13;13:16;
25:13,15;30:1,17;32:1,
7,20,21,24;33:7;34:4;
36:7,16;45:17,22;
46:20;47:1;51:10
separate (2)
8:14;24:17
separation (1)
38:5;39:5
serial (1)
7:24
Series (1)
19:18
serious (5)
26:6;28:19,21;43:7;
45:13
seriousness (2)
32:21;39:6
serve (1)
33:7
served (3)
26:4;32:14,18
serves (2)
32:16,19
service (2)
48:7;50:7
set (1)
28:8
setting (1)
27:20
seven (1)
19:24
several (2)
10:10;11:7
severity (1)
50:12
shall (8)
47:5,9,13,15,18,20,
24;48:6
share (1)
35:9
shirt (1)
27:4
short (2)
11:7;18:13
shortage (1)
18:6
shorthand (1)
11:5
show (4)
12:9;33:10;40:1;
44:2
showing (1)
48:2
sic (4)
26:22;34:4;35:6;
44:9
sick (2)
35:16;43:18
sickness (1)
39:16
sign (3)

14:24;15:1,1
signal (1)
44:18
signed (4)
15:19;16:2,13,13
significant (1)
8:19
signing (1)
16:1
simply (4)
38:6,7;41:25;44:10
sit (1)
3:18
situation (4)
27:10;29:15;35:18,
23
situations (1)
28:22
six (1)
26:5
six-month (1)
32:14
sized (1)
10:17
sleep (1)
38:24
small (1)
11:7
smoking (1)
26:7
sold (1)
43:15
solicit (1)
26:24
somebody (1)
13:24
somehow (1)
11:11
someone (1)
16:1
son (3)
35:13;36:19,20;
37:11,13
sons (1)
40:17
soon (1)
28:10
sores (1)
31:17
sorry (13)
17:11;21:2;40:18,20,
22,22,24,25;42:1,4,24;
52:6,8
sort (2)
8:13;11:5
sought (1)
39:4
sounds (1)
44:6
source (2)
10:25;11:17
speak (2)
26:16;36:22

**Special (8)**
3:9;41:19;46:15;
47:13;48:9,13;49:1,23

**specific (1)**
50:5

**spoke (1)**
31:13

**spoken (1)**
7:7

**spouse (1)**
23:25

**spouse's (1)**
23:15

**Springfield (1)**
26:23

**SQ (2)**
40:17;41:7

**squander (1)**
43:17

**stable (1)**
25:20

**stand (2)**
35:6;47:1

**standard (1)**
47:6

**start (2)**
26:12;35:8

**started (2)**
26:13;31:16,17

**stash (5)**
11:9,22;18:1;19:24;
27:21

**state (2)**
32:15;47:9

**stated (4)**
5:21,24;32:7;34:3

**statement (5)**
6:6,7,11;43:24;46:21

**statements (1)**
10:4

**States (10)**
3:2,9;9:16;18:16,19;
30:17;32:6;45:16;46:8;
52:16

**station (2)**
39:18;44:23

**step (1)**
10:18

**stepsons (1)**
5:2

**still (2)**
15:11;42:14

**stipulation (4)**
6:20,23;46:6,8

**stopped (1)**
11:18

**storage (1)**
9:4

**straight (1)**
26:12

**strains (1)**
43:24

**stretch (1)**

**34:7**

**strong (2)**
42:3,9

**stubs (1)**
48:2

**studies (1)**
33:10

**stuff (1)**
17:18

**stupid (2)**
28:14,14

**subject (5)**
22:7,25;47:6,13,15

**submission (1)**
48:2

**submit (4)**
33:18;39:7;47:18,20

**submitted (2)**
6:9;33:19

**substance (3)**
4:6;47:12,21

**substantial (3)**
8:22;10:8;12:10

**substantively (1)**
51:4

**successful (1)**
27:13

**suffer (1)**
42:20

**sufficient (5)**
33:7;34:12;38:22;
45:21;46:19

**suggest (4)**
9:24;10:14;12:18;
45:12

**Sullivan (1)**
9:16

**summon (1)**
38:16

**Superior (1)**
26:4

**superseded (1)**
52:11

**supervised (3)**
46:13;47:4,5

**support (3)**
6:10;25:5;41:24

**supporting (4)**
24:17,21;25:2,4

**supportive (1)**
37:6

**suppose (1)**
24:18

**supposed (1)**
31:3

**sure (7)**
8:24;12:7;14:21;
18:15;30:4;35:17;
50:10

**surprised (1)**
34:1

**surrender (1)**
9:13

**suspicion (1)**
47:15

## T

**table (2)**
3:18;37:22

**takedown (2)**
11:13,21

**talk (4)**
18:10;25:16;40:21,
22

**talking (4)**
11:8;17:16;18:3,4

**Tamar (1)**
3:15

**Task (1)**
3:10

**Taurus (1)**
7:24

**tax (14)**
12:9;14:5,7,8,14,16;
15:4,6,7,8,21,24,24;
16:1

**taxes (1)**
16:3

**telephone (1)**
10:20

**tells (1)**
41:17

**ten (3)**
26:7,21;30:11,13;
39:13

**tend (2)**
10:3;33:11

**term (1)**
12:5

**terms (1)**
45:14

**terrible (1)**
38:4

**test (1)**
35:10

**thereafter (1)**
47:20

**therefore (2)**
46:2,9

**thinking (3)**
38:2,13;40:11

**thirteen (1)**
5:6

**thirty-one (1)**
46:11

**Thompson (1)**
48:19

**thorough (1)**
25:13

**though (1)**
24:1

**thought (2)**
38:17;39:2

**thousand (1)**
21:14

**threat (1)**
44:25

**threatening (1)**
32:4

**three (3)**
16:18;39:18;44:23

**throat (1)**
26:10

**times (3)**
27:11;28:4;41:20

**today (16)**
7:12;8:6;23:24;
26:15,18;28:15,20;
29:23;35:6;36:2,22;
37:14;40:14;43:13;
51:19,22

**together (2)**
6:1;24:8

**told (4)**
4:7,10;31:13;42:19

**toll (1)**
39:23

**tomorrow (2)**
8:7;38:25

**took (6)**
18:1,5;20:3;29:12;
31:15;38:3

**tool (1)**
29:20

**tools (1)**
44:8

**top (1)**
31:19

**total (3)**
21:12;46:10;48:7

**totally (1)**
24:17

**touch (2)**
31:9,10

**towed (1)**
9:14

**Town (2)**
26:23;44:8

**track (2)**
28:1,1

**trafficking (4)**
12:4;28:15;46:1,24

**training (1)**
48:6

**transcript (1)**
6:1

**transcripts (1)**
44:4

**transfusion (1)**
31:14

**transfusions (3)**
31:4,5;32:3

**transported (2)**
17:6,8

**travel (1)**
29:22

**traveling (1)**
16:23

**treated (1)**
28:10

**treatment (3)**
30:22;31:21;47:22

**tried (1)**
25:12

**trip (1)**
17:20

**trouble (1)**
38:10

**truck (1)**
23:7

**truly (2)**
41:1;42:24

**Trust (1)**
40:6

**try (3)**
28:8;39:23;41:4

**trying (3)**
7:22;15:19;39:16

**turn (1)**
25:8

**twelve (1)**
26:7

**twice (2)**
39:15;47:20

**two (11)**
4:2;5:8;6:24;14:5;
16:18;19:13;24:3,5,25;
26:3;30:16

**two-level (2)**
6:22;7:14

**two-point (1)**
30:4

**typical (1)**
10:1

**typically (1)**
7:14

## U

**ultimately (3)**
9:8;27:15;28:11

**Um-hum (14)**
5:4;9:10;10:13;13:3;
14:15;16:20;17:5;
19:15;21:9;22:1,23;
23:8;24:10;25:11

**unbeknownst (1)**
28:2

**uncle (1)**
35:13

**unclear (1)**
14:19

**under (9)**
7:1,13,17;21:15;
22:4,14;30:7,17;46:8

**understands (2)**
34:8,9

**unfortunately (1)**
26:6

**unidentified (1)**
10:23

**union (4)**
20:12,17;21:10;
22:21
**uniquely (1)**
41:19
**United (10)**
3:2,9;9:15;18:16,19;
30:17;32:5;45:16;46:8;
52:16
**unknown (1)**
24:2
**unredacted (2)**
33:17,19
**untimely (1)**
44:1
**up (20)**
9:17,18;11:10;15:15;
21:21;23:6;27:9,20;
28:8;34:8,9;37:12;
38:4,4,14,24,25;39:3,
23;44:20
**upon (7)**
7:2;26:6;30:17;32:9;
33:9;34:13;46:6
**upstairs (2)**
7:22;8:4
**USA (1)**
3:3
**use (6)**
21:23;29:10,11;
37:21;47:12;50:13
**used (12)**
11:24;12:5;20:9;
29:2,5,20;31:12;35:16;
40:23;46:2;49:15,16
**using (2)**
11:5;38:7

**V**

**value (2)**
8:22;20:10
**vehicle (10)**
8:18;9:14,14,17,18;
21:17;22:15,19;23:5;
47:14
**vehicles (3)**
9:1,2;45:7
**verify (1)**
10:4
**VI (1)**
52:11
**view (2)**
12:14;46:21
**VII (1)**
52:11
**violent (1)**
7:8
**virtue (1)**
23:3
**visited (1)**
28:3
**vocational (2)**
45:9;48:6
**voluntarily (1)**
9:13
**vulgaris (2)**
30:18;38:11

**W**

**waiting (2)**
38:15,15
**wake (3)**
38:14,24,25
**walled (2)**
8:13,14
**wants (2)**
30:9;42:22
**warden (2)**
31:10,18
**warrant (1)**
30:16
**warranted (1)**
30:7
**warrants (2)**
28:1,1;30:21
**watch (1)**
41:13
**watching (3)**
41:9,10,11
**way (7)**
11:18;13:2;20:2;
31:1;39:25;40:2;49:4
**ways (1)**
45:4
**weapon (3)**
7:4;47:11;51:17
**week (3)**
48:5,5,7
**welcome (11)**
3:21,23;5:16;6:16;
34:19;36:4,18;37:16;
51:14,24;52:15
**wellbeing (1)**
28:6
**well-being (1)**
44:6
**West (1)**
8:1
**what's (1)**
28:15
**Whereupon (1)**
52:18
**whole (1)**
38:13
**wholesale (1)**
20:4
**who's (5)**
5:8;16:1;23:24;24:2;
27:1
**whose (1)**
43:13
**wife (2)**
23:17;24:2
**wiretap (3)**
7:5;17:4;44:4
**wiretaps (2)**
10:2,9
**wish (3)**
36:15;37:20;39:24
**withdraw (1)**
48:17
**withdrawal (1)**
48:20
**within (5)**
33:13;39:14;47:19;
50:14,20
**without (3)**
42:2,22;44:12
**woman (1)**
24:2
**women (1)**
42:4
**WOOLF (89)**
3:13,14,20;5:1,5,14,
17;9:12;13:9,14,17;
15:18;16:7,9,12,15,21;
17:2,5,8;18:7,15,23;
19:1,3,6,8,10;20:8,15,
19,21,23;21:1,3,7,10;
22:3,6,9,12,15,18,21,
24;23:16,19,23;24:3,8,
11,13,19,22,24;25:5,8,
10,12;28:24;29:2,8;
30:23;31:1,9,12;34:18,
20;35:2;36:5,9,13,17,
19;37:17,20;43:2,3,
48:13,16,18,22;49:2,4;
50:1,8,16;51:25;52:1
**Woolf's (1)**
9:6
**words (1)**
40:11
**work (2)**
22:2;44:23
**working (1)**
39:18
**world (1)**
38:12
**worry (2)**
38:20;42:20
**worrying (2)**
38:24;42:23
**worse (1)**
39:3
**worst (1)**
40:19
**worth (1)**
8:20
**written (2)**
8:6;50:15
**wrong (2)**
39:1;40:5
**Wyatt (2)**
28:4;31:7

**X**

**X-X-X-X-X-X (1)**
5:14

**Y**

**year (3)**
44:24,25;47:20
**years (10)**
5:6;13:21;25:19;
26:2,21;30:12,14;38:9;
39:13;42:22
**yesterday (2)**
9:21;49:15
**Yoda (1)**
22:15
**York (8)**
10:23;11:15;17:7,9,
15;18:5;19:4,8
**young (1)**
44:19

**1**

**1 (1)**
21:16
**1:07 (1)**
3:1
**10 (1)**
30:2
**100 (1)**
11:25
**100,000 (4)**
11:12,23;17:25;
19:23
**100-and-something-thousand (1)**
16:21
**100-dollar (1)**
46:15
**115 (1)**
11:6
**115,000 (8)**
10:22;12:2,17;13:18;
16:14;17:14;18:4;19:3
**120 (2)**
30:2,11
**120- (1)**
46:12
**120,000 (1)**
20:4
**121 (4)**
33:5,6;34:12;46:12
**130- (1)**
20:4
**136 (1)**
47:3
**151 (1)**
46:12
**1J219632 (1)**
7:24

**2**

**2 (4)**

**7:2;22:8,10,14
2:37 (1)**
52:18
**20 (1)**
22:17
**20,000 (1)**
22:25
**200 (1)**
49:17
**200,000 (4)**
10:16;11:19;16:15,
17
**20-plus (1)**
21:13
**210 (1)**
17:21
**210,000 (1)**
17:21
**25,000 (1)**
22:18
**26th (1)**
8:2

**3**

**3:17-CR-00160-VLB-1 (1)**
3:4
**30,000 (1)**
46:15
**300 (2)**
11:24,24
**300,000 (1)**
8:16
**35,000 (2)**
20:25;21:1
**3553 (2)**
43:5;46:17
**357 (1)**
7:24
**38 (1)**
7:25

**4**

**40,000 (4)**
20:11;22:6,13,22
**408 (1)**
8:2

**5**

**5 (3)**
30:15;46:14,15
**50,000 (1)**
46:14
**55 (1)**
5:3
**5H1.4 (1)**
30:17

**6**

**6 (1)**

19:18

**7**

**70,000 (3)**
  20:10,22,23

**8**

**8 (1)**
  32:7
**873 (1)**
  8:1

**9**

**91 (1)**
  16:23
**95 (1)**
  16:23